(Slip Opinion) OCTOBER TERM, 2008 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## REPUBLIC OF IRAQ *v.* BEATY ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 07–1090.  Argued April 20, 2009—Decided June 8, 2009*

The Foreign Sovereign Immunities Act of 1976 (FSIA) prohibits suits against other countries in American courts, 28 U. S. C. §1604, with certain exceptions.  One exception, §1605(a)(7) (now repealed), stripped a foreign state of immunity in any suit arising from certain acts of terrorism that occurred when the state was designated as a sponsor of terrorism under §6(j) of the Export Administration Act of 1979 or §620A of the Foreign Assistance Act of 1961.

Iraq was designated as a sponsor of terrorism in 1990, but in 2003, following the American-led invasion of Iraq, Congress enacted the Emergency Wartime Supplemental Appropriations Act (EWSAA), §1503 of which included a proviso clause (the second in a series of eight) authorizing the President to "make inapplicable with respect to Iraq [§]620A of the Foreign Assistance Act of 1961 or any other provision of law that applies to countries that have supported terrorism." Although President Bush exercised that authority, the D. C. Circuit held in its 2004 *Acree* decision that the EWSAA did not permit the President to waive §1605(a)(7), and thereby restore Iraq's sovereign immunity, for claims arising from actions Iraq took while designated as a sponsor of terrorism.

Thereafter, Congress repealed §1605(a)(7) in §1083(b)(1)(A)(iii) of the National Defense Authorization Act for Fiscal Year 2008 (NDAA) and replaced it with a new, roughly similar exception, §1083(a).  The NDAA also declared that nothing in EWSAA "ever authorized, directly or indirectly, the making inapplicable of any provision of [the FSIA] or the removal of the jurisdiction of any court" (thus purport-

——————

*Together with No. 08–539, *Republic of Iraq et al.* v. *Simon et al.,* also on certiorari to the same court.

Syllabus

ing to ratify *Acree*), §1083(c)(4); and authorized the President to
waive "any provision of this section with respect to Iraq" under cer-
tain conditions, §1083(d). On the same day the President signed the
NDAA into law he also waived all of §1083's provisions as to Iraq.

Respondents filed these suits against Iraq in early 2003, alleging
mistreatment by Iraqi officials during and after the 1991 Gulf War.
Under *Acree*, the courts below refused to dismiss either case on juris-
dictional grounds. The D. C. Circuit also rejected Iraq's alternative
argument that even if §1605(a)(7)'s application to it survived the
President's EWSAA waiver, the provision was repealed by NDAA
§1083(b)(1)(A)(iii); and that the President had waived NDAA
§1083(a)'s *new* exception with respect to Iraq under his §1083(d) au-
thority. The court held instead that it retained jurisdiction over
cases pending against Iraq when the NDAA was enacted.

*Held:* Iraq is no longer subject to suit in federal court. Pp. 6–17.

   (a) The District Court lost jurisdiction over both suits in May 2003,
when the President exercised his EWSAA authority to make
§1605(a)(7) "inapplicable with respect to Iraq." Pp. 6–13.

      (i) Iraq's (and the United States') reading of EWSAA §1503's sec-
ond proviso as sweeping in §1605(a)(7)'s terrorism exception to for-
eign sovereign immunity is straightforward. In the proviso's terms,
the exception is a "provision of law" (indisputably) that "applies to"
(strips immunity from) "countries that have supported terrorism" (as
designated pursuant to certain statutory provisions). Because he ex-
ercised his waiver authority with respect to "all" provisions of law en-
compassed by the second proviso, his actions made §1605(a)(7) "inap-
plicable" to Iraq. Pp. 6–7.

      (ii) *Acree*'s resistance to the above construction was based on a
sophisticated attempt to construe EWSAA §1503's second proviso as
limiting that section's principal clause, which authorized suspension
of "any provision of the Iraq Sanctions Act of 1990." While a proviso's
"general office . . . is to except something from the enacting clause, or
to qualify and restrain its generality," *United States* v. *Morrow*, 266
U. S. 531, 534, another recognized use is "to introduce independent
legislation," *id.,* at 535, which was the function of the proviso here.
In any event, §1605(a)(7) falls within the scope of the proviso even
accepting the narrower interpretation adopted by the *Acree* decision.
Pp. 7–11.

      (iii) Respondents' other objections to the straightforward inter-
pretation of EWSAA §1503's proviso are rejected. Pp. 11–12.

      (iv) Nothing in the NDAA changes the above analysis. Although
NDAA §1083(c)(4) appears to ratify *Acree*, this Court need not decide
whether such a ratification is effective because §1083(d)(1) author-
ized the President to "waive any provision of this section with respect

Syllabus

to Iraq," and he waived "all" such provisions, including §1083(c)(4). Pp. 12–13.

(b) The Court rejects the argument that §1605(a)(7)'s inapplicability does not bar claims arising from Iraq's conduct *prior* to the President's waiver. In order to exercise jurisdiction over these cases, the District Court had to "apply" §1605(a)(7) with respect to Iraq, but the President's waiver made that provision "inapplicable." No retroactivity problem is posed by this construction, if only because the primary conduct by Iraq that forms the basis for these suits actually occurred before §1605(a)(7)'s enactment. Pp. 13–16.

(c) Respondents also argue that EWSAA §1503's sunset clause— under which "the authorities contained in [that] section" expired in 2005—revived §1605(a)(7) and restored jurisdiction as of the sunset date. But expiration of the §1503 *authorities* is not the same as cancellation of the *effect* of the prior valid exercise of those authorities. Pp. 16–17.

No. 07–1090, and No. 08–539, 529 F. 3d 1187, reversed.

SCALIA, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 07–1090 and 08–539

———————

REPUBLIC OF IRAQ, PETITIONER
07–1090          *v.*
JORDAN BEATY ET AL.

REPUBLIC OF IRAQ, ET AL., PETITIONERS
08–539          *v.*
ROBERT SIMON ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 8, 2009]

JUSTICE SCALIA delivered the opinion of the Court.

We consider in these cases whether the Republic of Iraq remains subject to suit in American courts pursuant to the terrorism exception to foreign sovereign immunity, now repealed, that had been codified at 28 U. S. C. §1605(a)(7).

I

A

Under the venerable principle of foreign sovereign immunity, foreign states are ordinarily "immune from the jurisdiction of the courts of the United States and of the States," §1604. See generally *Schooner Exchange* v. *McFaddon,* 7 Cranch 116 (1812). But the statute embodying that principle—the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U. S. C. §1602 *et seq.*—recognizes a number of exceptions; if any of these is applicable, the state is subject to suit, and federal district courts have

jurisdiction to adjudicate the claim. §1330(a); *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 489 (1983).

In 1996, Congress added to the list of statutory exceptions one for state sponsors of terrorism, which was codified at 28 U. S. C. §1605(a)(7). Subject to limitations not relevant here, that exception stripped immunity in any suit for money damages

> "against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act . . . except that the court shall decline to hear a claim under this paragraph—
>
> "(A) if the foreign state was not designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U. S. C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U. S. C. 2371) at the time the act occurred . . . ."

In brief, §1605(a)(7) stripped immunity from a foreign state for claims arising from particular acts, if those acts were taken at a time when the state was designated as a sponsor of terrorism.

B

In September 1990, Acting Secretary of State Lawrence Eagleburger formally designated Iraq, pursuant to §6(j) of the Export Administration Act of 1979, as redesignated and amended, 99 Stat. 135, 50 U. S. C. App. §2405(j), as "a country which has repeatedly provided support for acts of international terrorism," 55 Fed. Reg. 37793. Over a decade later, in March 2003, the United States and a coalition of allies initiated military action against that country. In a matter of weeks, the regime of Iraqi dictator Saddam Hussein collapsed and coalition forces occupied

Baghdad. American attention soon shifted from combat operations to the longer term project of rebuilding Iraq, with the ultimate goal of creating a stable ally in the region.

Toward that end, Congress enacted in April 2003 the Emergency Wartime Supplemental Appropriations Act (EWSAA), 117 Stat. 559. Section 1503 of that Act authorized the President to "make inapplicable with respect to Iraq section 620A of the Foreign Assistance Act of 1961 or any other provision of law that applies to countries that have supported terrorism." *Id.*, at 579. President George W. Bush exercised that authority to its fullest extent in May 2003, declaring "inapplicable with respect to Iraq section 620A of the Foreign Assistance Act of 1961 . . . and any other provision of law that applies to countries that have supported terrorism." 68 Fed. Reg. 26459.

Shortly thereafter, the United States Court of Appeals for the District of Columbia Circuit had occasion to consider whether that Presidential action had the effect of rendering inapplicable to Iraq the terrorism exception to foreign sovereign immunity. The Court concluded in a divided panel decision that the President's EWSAA authority did not permit him to waive §1605(a)(7), and thereby restore sovereign immunity to Iraq, for claims arising from acts it had taken while designated as a sponsor of terror. *Acree* v. *Republic of Iraq*, 370 F. 3d 41, 48 (2004). Because Iraq succeeded in having the claims against it dismissed on other grounds, *id.*, at 59–60, it could not seek certiorari to challenge the D. C. Circuit's interpretation of the EWSAA.

C

There is yet another legislative enactment, and yet another corresponding executive waiver, that bear on the question presented. The National Defense Authorization Act for Fiscal Year 2008 (NDAA), 122 Stat. 3, was passed

in January 2008.  That Act (1) repealed the FSIA's terrorism exception, §1083(b)(1)(A)(iii); (2) replaced it with a new, roughly similar exception, §1083(a); (3) declared that nothing in §1503 of the EWSAA had "ever authorized, directly or indirectly, the making inapplicable of any provision of chapter 97 of title 28, United States Code, or the removal of the jurisdiction of any court of the United States" (thus purporting to ratify the Court of Appeals' *Acree* decision), §1083(c)(4), 122 Stat. 343; and (4) authorized the President to waive "any provision of this section with respect to Iraq" so long as he made certain findings and so notified Congress within 30 days, §1083(d), *id.*, at 343–344.

The last provision was added to the NDAA after the President vetoed an earlier version of the bill, which did not include the waiver authority.  The President's veto message said that the bill "would imperil billions of dollars of Iraqi assets at a crucial juncture in that nation's reconstruction efforts."  Memorandum to the House of Representatives Returning Without Approval the "National Defense Authorization Act for Fiscal Year 2008," 43 Weekly Comp. of Pres. Doc. 1641 (2007).  Only when Congress added the waiver authority to the NDAA did the President agree to approve it; and on the same day he signed it into law he also officially waived "all provisions of section 1083 of the Act with respect to Iraq," 73 Fed. Reg. 6571 (2008).

## II

We consider today two cases that have been navigating their way through the lower courts against the backdrop of the above-described congressional, military, Presidential, and judicial actions.  Respondents in the *Simon* case are American nationals (and relatives of those nationals) who allege that they were captured and cruelly mistreated by Iraqi officials during the 1991 Gulf War.  The *Beaty* re-

spondents are the children of two other Americans, Kenneth Beaty and William Barloon, who are alleged to have been similarly abused by the regime of Saddam Hussein in the aftermath of that war. Each set of respondents filed suit in early 2003 against Iraq in the United States District Court for the District of Columbia, alleging violations of local, federal, and international law.

Respondents invoked the terrorism exception to foreign sovereign immunity, and given *Acree*'s holding that the President had not rendered that statutory provision inapplicable to Iraq, the District Court refused to dismiss either case on jurisdictional grounds. In *Beaty*, after the District Court denied Iraq's motion to dismiss, 480 F. Supp. 2d 60, 70 (2007), Iraq invoked the collateral order doctrine to support an interlocutory appeal. See *Mitchell* v. *Forsyth*, 472 U. S. 511, 524–529 (1985). In *Simon*, the District Court determined that the claims were time barred and dismissed on that alternative basis, *Vine* v. *Republic of Iraq*, 459 F. Supp. 2d 10, 25 (2006), after which the *Simon* respondents appealed.

In the *Beaty* appeal, Iraq (supported by the United States as *amicus*) requested that the Court of Appeals for the District of Columbia Circuit reconsider *Acree*'s holding en banc. The Court denied that request over the dissent of Judges Brown and Kavanaugh, and a panel then summarily affirmed in an unpublished order the District Court's denial of Iraq's motion to dismiss. No. 07–7057 (Nov. 21, 2007) *(per curiam)*, App. to Pet. for Cert. 1a–2a.

While the *Simon* appeal was still pending, Congress enacted the NDAA, and the Court of Appeals requested supplemental briefing addressing the impact of that legislation on the court's jurisdiction. Iraq contended, as an alternative argument to its position that *Acree* was wrongly decided, that even if 28 U. S. C. §1605(a)(7)'s application to Iraq survived the President's EWSAA waiver, the provision was repealed by §1083(b)(1)(A)(iii) of

the NDAA, 122 Stat. 341; and that the *new* terrorism exception to sovereign immunity—which was created by the NDAA and codified at 28 U. S. C. A. §1605A (July 2008 Supp.)—was waived by the President with respect to Iraq pursuant to his NDAA authority.

The Court of Appeals rejected that argument, holding instead, based on a close reading of the statutory text, that "the NDAA leaves intact our jurisdiction over cases . . . that were pending against Iraq when the Congress enacted the NDAA." 529 F. 3d 1187, 1194 (2008). The panel then reversed the District Court's determination that the *Simon* respondents' claims were untimely, *id.*, at 1195–1196, and rebuffed Iraq's request for dismissal under the political question doctrine, *id.*, at 1196–1198.

Iraq sought this Court's review of both cases, asking us to determine whether under current law it remains subject to suit in the federal courts. We granted certiorari, 555 U. S. \_\_\_ (2009), and consolidated the cases.

## III
### A

Section 1503 of the EWSAA consists of a principal clause, followed by eight separate proviso clauses. The dispute in these cases concerns the second of the provisos. The principal clause and that proviso read:

> "The President may suspend the application of any provision of the Iraq Sanctions Act of 1990: . . . *Provided further*, That the President may make inapplicable with respect to Iraq section 620A of the Foreign Assistance Act of 1961 or any other provision of law that applies to countries that have supported terrorism . . . ." 117 Stat. 579.

Iraq and the United States both read the quoted proviso's residual clause as sweeping in the terrorism exception to foreign sovereign immunity. Certainly that reading is, as

even the *Acree* Court acknowledged, "straightforward." 370 F. 3d, at 52.

Title 28 U. S. C. §1605(a)(7)'s exception to sovereign immunity for state sponsors of terrorism stripped jurisdictional immunity from a country unless "the foreign state was not designated as a state sponsor of terrorism." This is a "provision of law" (indisputably) that "applies to" (strips immunity from) "countries that have supported terrorism" (as designated pursuant to certain statutory provisions). Of course the word "any" (in the phrase "any other provision of law") has an "expansive meaning," *United States* v. *Gonzales*, 520 U. S. 1, 5 (1997), giving us no warrant to limit the class of provisions of law that the President may waive. Because the President exercised his authority with respect to "all" provisions of law encompassed by the second proviso, his actions made §1605(a)(7) "inapplicable" to Iraq.

To a layperson, the notion of the President's suspending the operation of a valid law might seem strange. But the practice is well established, at least in the sphere of foreign affairs. See *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 322–324 (1936) (canvassing precedents from as early as the "inception of the national government"). The granting of Presidential waiver authority is particularly apt with respect to congressional elimination of foreign sovereign immunity, since the granting or denial of that immunity was historically the case-by-case prerogative of the Executive Branch. See, *e.g.*, *Ex parte Peru*, 318 U. S. 578, 586–590 (1943). It is entirely unremarkable that Congress, having taken upon itself in the FSIA to "free the Government" from the diplomatic pressures engendered by the case-by-case approach, *Verlinden*, 461 U. S., at 488, would nonetheless think it prudent to afford the President some flexibility in unique circumstances such as these.

## B

The Court of Appeals in *Acree* resisted the above construction, primarily on the ground that the relevant text is found in a proviso. We have said that, at least presumptively, the "grammatical and logical scope [of a proviso] is confined to the subject-matter of the principal clause." *United States* v. *Morrow*, 266 U. S. 531, 534–535 (1925). Using that proposition as a guide, the *Acree* panel strove mightily to construe the proviso as somehow restricting the principal clause of EWSAA §1503, which authorized the President to suspend "any provision of the Iraq Sanctions Act of 1990," 117 Stat. 579.

In the Court of Appeals' view, the second proviso related to that subsection of the Iraq Sanctions Act (referred to in the principal provision) which dictated that certain enumerated statutory provisions, including §620A of the Foreign Assistance Act of 1961 and "all other provisions of law that *impose sanctions* against a country which has repeatedly provided support for acts of international terrorism," shall be fully enforced against Iraq. §586F(c), 104 Stat. 2051 (emphasis added). The panel understood the second EWSAA proviso as doing nothing more than clarifying that the authority granted by the principal clause (to suspend any part of the Iraq Sanctions Act) included the power to make inapplicable to Iraq the various independent provisions of law that §586F(c) of the Iraq Sanctions Act instructed to be enforced against Iraq—which might otherwise continue to apply of their own force even without the Iraq Sanctions Act. However, the residual clause of §586F(c) encompasses only provisions that "impose sanctions"; and, in the Court of Appeals' view, that excludes §1605(a)(7), which is a rule going instead to the jurisdiction of the federal courts. Thus, the EWSAA proviso swept only as broadly as §586F(c), and therefore did not permit the President to waive the FSIA terrorism exception.

This is a highly sophisticated effort to construe the proviso as a limitation upon the principal clause. Ultimately, however, we think that effort neither necessary nor successful. It is true that the "general office of a proviso is to except something from the enacting clause, or to qualify and restrain its generality." *Morrow*, *supra*, at 534. But its general (and perhaps appropriate) office is not, alas, its exclusive use. Use of a proviso "to state a general, independent rule," *Alaska* v. *United States*, 545 U. S. 75, 106 (2005), may be lazy drafting, but is hardly a novelty. See, *e.g.*, *McDonald* v. *United States*, 279 U. S. 12, 21 (1929). *Morrow* itself came with the caveat that a proviso is sometimes used "to introduce independent legislation." 266 U. S., at 535. We think that was its office here. The principal clause granted the President a power; the second proviso purported to grant him an *additional* power. It was not, on any fair reading, an exception to, qualification of, or restraint on the principal power.

Contrasting the second EWSAA proviso to some of the other provisos illustrates the point. For example, the first proviso cautioned that "nothing in this section shall affect the applicability of the Iran-Iraq Arms Non-Proliferation Act of 1992," 117 Stat. 579, and the third forbade the export of certain military equipment "under the authority of this section." *Ibid.* Both of these plainly sought to define and limit the authority granted by the principal clause. The fourth proviso, however, mandated that "section 307 of the Foreign Assistance Act of 1961 shall not apply with respect to programs of international organizations for Iraq," *ibid.*, and it is impossible to see how that self-executing suspension of a distinct statute in any way cabined or clarified the principal clause's authorization to suspend the Iraq Sanctions Act.

There are other indications that the second proviso's waiver authority was not limited to the statutory provi-

sions embraced by §586F(c) of the Iraq Sanctions Act. If that is all it was meant to accomplish, why would Congress not simply have tracked §586F(c)'s residual clause? Instead of restricting the President's authority to statutes that "impose sanctions" on sponsors of terror, the EWSAA extended it to any statute that "applies" to such states. That is undoubtedly a broader class.

Even if the best reading of the EWSAA proviso were that it encompassed only statutes that impose sanctions or prohibit assistance to state sponsors of terrorism, see *Acree*, 370 F. 3d, at 54, we would disagree with the Court of Appeals' conclusion that the FSIA exception is not such a law. Allowing lawsuits to proceed certainly has the extra benefit of facilitating the compensation of injured victims, but the fact that §1605(a)(7) targeted only foreign states designated as sponsors of terrorism suggests that the law was intended as a sanction, to punish and deter undesirable conduct. Stripping the immunity that foreign sovereigns ordinarily enjoy is as much a sanction as eliminating bilateral assistance or prohibiting export of munitions (both of which are explicitly mandated by §586F(c) of the Iraq Sanctions Act). The application of this sanction affects the jurisdiction of the federal courts, but that fact alone does not deprive it of its character as a sanction.

It may well be that when Congress enacted the EWSAA it did not have specifically in mind the terrorism exception to sovereign immunity. The Court of Appeals evidently found that to be of some importance. *Id.*, at 56 (noting there is "no reference in the legislative history to the FSIA"). But the whole value of a generally phrased residual clause, like the one used in the second proviso, is that it serves as a catchall for matters not specifically contemplated—known unknowns, in the happy phrase coined by Secretary of Defense Donald Rumsfeld. Pieces of Intelligence: The Existential Poetry of Donald H. Rumsfeld 2 (H. Seely comp. 2003). If Congress wanted to limit the waiver

authority to particular statutes that it had in mind, it could have enumerated them individually.

We cannot say with any certainty (for those who think this matters) whether the Congress that passed the EWSAA *would have wanted* the President to be permitted to waive §1605(a)(7). Certainly the exposure of Iraq to billions of dollars in damages could be thought to jeopardize the statute's goal of speedy reconstruction of that country. At least the President thought so. And in the "vast external realm, with its important, complicated, delicate and manifold problems," *Curtiss-Wright Export Corp.*, 299 U. S., at 319, courts ought to be especially wary of overriding apparent statutory text supported by executive interpretation in favor of speculation about a law's true purpose.[1]

### C

Respondents advance two other objections to the straightforward interpretation of the EWSAA proviso. First, in a less compelling variant of the D. C. Circuit's approach, the *Simon* respondents argue that "section 620A of the Foreign Assistance Act of 1961 or any other provision of law that applies to countries that have supported terrorism" means section 620A of the Foreign Assistance Act or any other provision of law cited therein. The provision would thus allow the President to make inapplicable to Iraq the statutes that §620A precludes from being used to provide support to terror-sponsoring nations. Not to put too fine a point upon it, that is an absurd reading, not

---

[1] The eighth proviso of EWSAA §1503 says that absent further congressional action, "the authorities contained in this section shall expire on September 30, 2004." 117 Stat. 579. The Court of Appeals expressed doubt that Congress would have wanted federal-court jurisdiction to disappear for a year and then suddenly return. *Acree* v. *Republic of Iraq*, 370 F. 3d 41, 56–57 (CADC 2004). Our analysis of the sunset provision, see Part V, *infra*, disposes of that concern.

only textually but in the result it produces: It would mean that the effect of the EWSAA was to permit the President to *exclude* Iraq from, rather than *include* it within, such beneficent legislation as the Food for Peace Act of 1966, 7 U. S. C. §1691 *et seq.*

Both respondents also invoke the canon against implied repeals, *TVA* v. *Hill*, 437 U. S. 153, 190 (1978), but that canon has no force here. Iraq's construction of the statute neither rests on implication nor effects a repeal. The EWSAA proviso *expressly* allowed the President to render certain statutes inapplicable; the only question is its scope. And it did not repeal anything, but merely granted the President authority to waive the application of particular statutes to a single foreign nation. Cf. *Clinton* v. *City of New York*, 524 U. S. 417, 443–445 (1998).

## D

We must consider whether anything in the subsequent NDAA legislation changes the above analysis. In particular, §1083(c)(4) of that statute specifically says that "[n]othing in section 1503 of the [EWSAA] has ever authorized, directly or indirectly, the making inapplicable of any provision of chapter 97 of title 28, United States Code, or the removal of the jurisdiction of any court of the United States." 122 Stat. 343. This looks like a ratification by Congress of the conclusion reached in the *Acree* decision.

Is such a ratification effective? The NDAA is not subsequent legislative history, as Iraq claims, cf. *Sullivan* v. *Finkelstein*, 496 U. S. 617, 632 (1990) (SCALIA, J., concurring in part); rather, it is binding law, approved by the Legislature and signed by the President. Subsequent legislation can of course alter the meaning of an existing law for the future; and it can even alter the past operation of an existing law (constitutional objections aside) if it makes that retroactive operation clear. *Landgraf* v. *USI*

*Film Products*, 511 U. S. 244, 267–268 (1994). To tell the truth, however, we are unaware of any case dealing with the retroactive amendment of a law that had already expired, as the EWSAA had here. And it is doubtful whether Congress can retroactively claw back power it has given to the Executive, invalidating Presidential action that was valid when it was taken. Thankfully, however, we need not explore these difficulties here.

In §1083(d)(1) of the NDAA, the President was given authority to "waive any provision of this section with respect to Iraq." 122 Stat. 343. The President proceeded to waive "all" provisions of that section as to Iraq, including (presumably) §1083(c)(4). 73 Fed. Reg. 6571. The Act can therefore add nothing to our analysis of the EWSAA. Respondent Beaty objects that the President cannot waive a *fact*. But neither can Congress legislate a fact. Section 1083(c)(4) could change our interpretation of the disputed EWSAA language only if it has some *substantive* effect, changing what would otherwise be the law. And if the President's waiver does anything, it eliminates any substantive effect that the NDAA would otherwise have on cases to which Iraq is a party.[2]

## IV

Having concluded that the President did render 28 U. S. C. §1605(a)(7) "inapplicable with respect to Iraq," and that such action was within his assigned powers, we consider respondents' argument that the inapplicability of

---

[2] Respondents contend that the NDAA waiver is irrelevant because the President's veto of the *initial* version of the bill—which did not include the waiver authority—was defective. We need not inquire into that point, since Congress (evidently thinking the veto effective) enacted a new bill that was identical in all material respects but for the addition of presidential waiver authority. Since that authority would be nugatory, and the rest of the new law utterly redundant, if a law resulting from the former bill remained in effect, that law would have been effectively repealed.

the provision does not bar their claims, since they arise
from Iraq's conduct *prior* to the President's waiver. Any
other interpretation, they say, would cause the law to
operate in a disfavored retroactive fashion.

This argument proceeds as follows: The FSIA exception
becomes "applicable" to a foreign state when that foreign
state is designated as a sponsor of terrorism. In parallel
fashion, rendering the exception "inapplicable" should be
equivalent to *removing* the state's designation. And under
§1605(a)(7), jurisdiction turned on the foreign state's
designation "at the time the act [giving rise to the claim]
occurred." On this reading, the President's waiver meant
only that Iraq could not be sued pursuant to §1605(a)(7)
for any *future* conduct, even though it technically re-
mained designated as a state sponsor of terrorism.

Respondents support this interpretation with a policy
argument and a canon of construction. First, why would
Congress have sought to give Iraq *better* treatment than
any other state that saw the error of its ways, reformed its
behavior, and was accordingly removed from the list of
terror-sponsoring regimes? See *Acree*, 370 F. 3d, at 56
(calling such a result "perplexing"). Providing immunity
for future acts is one thing, but wiping the slate clean is
quite another. Second, this Court has often applied a
presumption that, absent clear indication to the contrary,
statutory amendments do not apply to pending cases.
*Landgraf, supra*, at 280. A narrow reading of "inapplica-
ble" would better comport with that presumption.

As a textual matter, the proffered definition of "inappli-
cable" is unpersuasive. If a provision of law is "inapplica-
ble" then it cannot be applied; to "apply" a statute is "[t]o
put [it] to use." Webster's New International Dictionary
131 (2d ed. 1954). When the District Court exercised
jurisdiction over these cases against Iraq, it surely was
putting §1605(a)(7) to use with respect to that country.
Without the *application* of that provision, there was no

basis for subject-matter jurisdiction. 28 U. S. C. §§1604, 1330(a). If Congress had wanted to authorize the President merely to cancel Iraq's designation as a state sponsor of terrorism, then Congress could have done so.

As a policy matter, moreover, we do not find that result particularly "perplexing." As then-Judge Roberts explained in his separate opinion in *Acree*, Congress in 2003 "*for the first time* confronted the prospect that a friendly successor government would, in its infancy, be vulnerable under Section 1605(a)(7) to crushing liability for the actions of its renounced predecessor." 370 F. 3d, at 61 (opinion concurring in part and concurring in judgment) (emphasis in original). The Government was at the time spending considerable sums of money to rebuild Iraq, see Rogers, Congress Gives Initial Approval for War Funding, Airline Aid, Wall Street Journal, Apr. 4, 2003, p. A10. What would seem perplexing is converting a billion-dollar reconstruction project into a compensation scheme for a few of Saddam's victims.

As for the judicial presumption against retroactivity, that does not induce us to read the EWSAA proviso more narrowly. Laws that merely alter the rules of foreign sovereign immunity, rather than modify substantive rights, are not operating retroactively when applied to pending cases. Foreign sovereign immunity "reflects current political realities and relationships," and its availability (or lack thereof) generally is not something on which parties can rely "in shaping their primary conduct." *Republic of Austria* v. *Altmann*, 541 U. S. 677, 696 (2004); see also *id.*, at 703 (SCALIA, J., concurring).

In any event, the primary conduct by Iraq that forms the basis for these suits actually occurred prior to the enactment of the FSIA terrorism exception in 1996. See *Saudi Arabia* v. *Nelson*, 507 U. S. 349, 351 (1993). That is, Iraq was immune from suit at the time it is alleged to have harmed respondents. The President's elimination of

Iraq's *later* subjection to suit could hardly have deprived respondents of any expectation they held at the time of their injury that they would be able to sue Iraq in United States courts.

V

Accordingly, the District Court lost jurisdiction over both suits in May 2003, when the President exercised his authority to make §1605(a)(7) inapplicable with respect to Iraq. At that point, immunity kicked back in and the cases ought to have been dismissed, "the only function remaining to the court [being] that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 7 Wall. 506, 514 (1869).

In respondents' view, that is not fatal to their claims. They point to the eighth proviso in §1503 of the EWSAA:

> "*Provided further*, That the authorities contained in this section shall expire on September 30, 2004, or on the date of enactment of a subsequent Act authorizing assistance for Iraq and that specifically amends, repeals or otherwise makes inapplicable the authorities of this section, whichever occurs first." 117 Stat. 579.

The effect of this provision, they contend, is that the EWSAA waiver expired in 2005,[3] and that when it did so §1605(a)(7) was revived, immunity was again stripped, and jurisdiction was restored. If that is true, then at the very least they ought to be permitted to refile their suits and claim equitable tolling for the period between 2005 and the present, during which time they understandably relied on *Acree*'s holding.

The premise, however, is flawed. It is true that the "authorities contained in" §1503 of the EWSAA expired, but expiration of the *authorities* (viz., the President's

_____

[3] The sunset date was extended by one year in a later bill. 108–106, §2204(2), 117 Stat. 1230.

powers to suspend and make inapplicable certain laws) is not the same as cancellation of the *effect* of the President's prior valid exercise of those authorities (viz., the restoration of sovereign immunity). As Iraq points out, Congress has in other statutes provided explicitly that *both* the authorities granted *and* the effects of their exercise sunset on a particular date. *E.g.*, 19 U. S. C. §2432(c)(3) ("A waiver with respect to any country shall terminate on the day after the waiver authority granted by this subsection ceases to be effective with respect to such country"). The EWSAA contains no such language.

We think the better reading of the eighth EWSAA proviso (the sunset clause) is that the powers granted by the section could be exercised only for a limited time, but that actions taken by the President pursuant to those powers (*e.g.*, suspension of the Iraq Sanctions Act) would not lapse on the sunset date. If it were otherwise, then the Iraq Sanctions Act—which has never been repealed, and which imposes a whole host of restrictions on relations with Iraq—would have returned to force in September 2005. Nobody believes that is so.

\*    \*    \*

When the President exercised his authority to make inapplicable with respect to Iraq all provisions of law that apply to countries that have supported terrorism, the exception to foreign sovereign immunity for state sponsors of terrorism became inoperative as against Iraq. As a result, the courts below lacked jurisdiction; we therefore need not reach Iraq's alternative argument that the NDAA subsequently stripped jurisdiction over the cases. The judgments of the Court of Appeals are reversed.

*It is so ordered.*