# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 12, 2009           Decided July 28, 2009

No. 07-7132

AMIR REZA OVEISSI,
APPELLANT

v.

ISLAMIC REPUBLIC OF IRAN AND IRANIAN MINISTRY OF
INFORMATION AND SECURITY,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 03cv01197)

*James W. Spertus* argued the cause for appellant. With him
on the brief was *Ezra D. Landes*

Before: ROGERS, GARLAND, and BROWN, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: The plaintiff in this case is the
grandson of Gholam Oveissi, who was chief of the Iranian
armed forces under the Shah's regime. Members of the terrorist
organization Hezbollah, operating under the name Islamic Jihad,
assassinated Oveissi in Paris in 1984. In 2003, the plaintiff sued

the Islamic Republic of Iran and the Iranian Ministry of Information and Security (MOIS) in the United States District Court for the District of Columbia, alleging that the defendants had funded and directed Islamic Jihad.  The district court found that Iran and MOIS were not entitled to sovereign immunity and that they were culpable in Oveissi's murder, but the court rejected the plaintiff's claims for intentional infliction of emotional distress and wrongful death.  We conclude that the court applied the wrong law to the plaintiff's claims because it conducted an erroneous choice-of-law analysis.  Accordingly, we reverse the judgment and remand the case for further proceedings.

I

Gholam Oveissi, an Iranian citizen, served as a four-star general and chief of Iran's armed forces until early 1979.  In that year, revolutionaries deposed the Shah and established an Islamic Republic.  Oveissi, a supporter of the Shah's government, fled the country, traveling first to the United States and then to France, where he took up residence in Paris.  Oveissi's son and daughter-in-law also fled from Iran to the United States.  Their son, plaintiff Amir Oveissi, was born during their stay in California.  Several months after the plaintiff's birth, his family moved to Paris, where they shared an apartment with Gholam Oveissi.

"While the family lived together in Paris, Gholam was outspoken in his opposition to Iran's revolutionary government and met with other expatriates in the family's apartment." *Oveissi v. Islamic Republic of Iran*, 498 F. Supp. 2d 268, 274 (D.D.C. 2007).  Fearing reprisal for his political views, Oveissi hired a bodyguard.  Despite this precaution, on February 17, 1984, Oveissi was shot and killed while he walked on a crowded Paris street.  Members of the terrorist group Hezbollah,

operating under the name Islamic Jihad, "immediately claimed responsibility," and the district court found "[n]o reason . . . to dispute this claim." *Id.* Oveissi's family left Paris as soon as they learned of the assassination, traveling first to Morocco for eighteen months and then to the United States, where they eventually settled in Virginia.

On June 2, 2003, the plaintiff filed a complaint against Iran and MOIS in the United States District Court for the District of Columbia, invoking the court's jurisdiction under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602 *et seq.* The complaint alleged causes of action for, inter alia, intentional infliction of emotional distress (IIED) and wrongful death. The plaintiff filed an amended complaint on December 31, 2005, and effected service of process through diplomatic channels on May 30, 2006, pursuant to 28 U.S.C. § 1608(a)(4).

Iran failed to enter an appearance or respond to the complaint. The FSIA, however, "does not automatically entitle a plaintiff to judgment when a foreign state defaults," and instead requires a court "to satisfy itself that [the plaintiff has] established a right to relief." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003) (citing 28 U.S.C. § 1608(e)). The district court therefore conducted a bench trial, receiving evidence from the plaintiff, Gholam Oveissi's bodyguard, and an international terrorism expert. The court summarized the expert's testimony as follows:

> [I]n the early 1980s, members of Hezbollah, under the direction of MOIS, engaged in terrorist activities outside the Middle East using the nom-de-guerre "Islamic Jihad." These activities included assassinations of expatriate Iranian dissidents, mainly in France. In [the expert's] opinion, the killings were intended to silence the Iranian regime's critics and to

> deter French intervention in Lebanon. . . . As well as guiding Hezbollah's terrorist activities, Iran, through MOIS and other entities, provided logistical support and training that, according to [the expert], were crucial to Hezbollah's ability to carry out the assassinations.

*Oveissi*, 498 F. Supp. 2d at 273-74 (footnote omitted). Based on this evidence, the court concluded that the then-applicable terrorism exception to the FSIA, 28 U.S.C. § 1605(a)(7), stripped Iran of its immunity from suit, and that Iran and MOIS were culpable in Oveissi's assassination.

The court nonetheless dismissed all of the plaintiff's claims. With respect to the IIED claim, the court began by conducting a choice-of-law analysis. Applying District of Columbia choice-of-law rules, it determined that ordinarily the "the law of the plaintiff's domicile at the time of the acts at issue" would govern the claim. *Oveissi*, 498 F. Supp. 2d at 280. Although the court found that the plaintiff was a domiciliary of France at the time of the 1984 assassination, it concluded that domiciliary status was not determinative in the instant case. "[T]he United States," the court said, "has a unique interest in having its domestic law apply when its citizens are injured by state-sponsored terrorist acts." *Id.* at 281 (internal quotation marks omitted). Because the plaintiff was born in California and had briefly resided there, the court determined that it should apply California law to the IIED claim. In light of its reading of California law, however, the court concluded that the plaintiff "lack[ed] standing to bring an IIED claim based on [Gholam Oveissi's] death." *Id.* at 283.

Without applying a choice-of-law analysis, the court found the plaintiff's wrongful-death claim barred by Lord Campbell's Act, a law enacted by the British Parliament in 1846 that became the prototype for wrongful-death statutes in many American

states. *Id.* at 277-79; *see Sea-Land Servs., Inc. v. Gaudet*, 414 U.S. 573, 579-80 (1974). Lord Campbell's Act permits certain near relatives to bring a wrongful-death action against a tortfeasor if the deceased would have been "entitled . . . to maintain an Action . . . if Death had not ensued" and the deceased had merely been injured. Lord Campbell's Act, 9 & 10 Vict., ch. 93, An Act for compensating the Families of Persons killed by Accidents (Aug. 26, 1846); *see* RESTATEMENT (SECOND) OF TORTS § 925 cmt. a (1979). Although the plaintiff is a U.S. citizen and is thereby entitled to bring an action under the terrorism exception of the FSIA if the other statutory conditions are met, *see* 28 U.S.C. § 1605(a)(7)(A), (B), Gholam Oveissi was an Iranian citizen and could not himself have sued under the terrorism exception had he survived the attack. "Because no action could have been brought by the deceased if still alive," the court thought it had to dismiss the plaintiff's wrongful-death claim. *Oveissi*, 498 F. Supp. 2d at 279 (internal quotation mark omitted).

The plaintiff now appeals from the district court's dismissal of his amended complaint.

II

We begin with some necessary background regarding the FSIA. The Act "grants United States courts both subject matter and personal jurisdiction (where service of process has been made) over any claim against a foreign state as to which the state is not entitled to immunity." *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1159 n.5 (D.C. Cir. 2002) (citing 28 U.S.C. § 1330(a), (b)). Under the FSIA, foreign states generally are entitled to immunity unless the case falls within one of a list of statutory exceptions. 28 U.S.C. § 1604; *see Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004). In 1996, Congress amended

the FSIA, adding an exception -- § 1605(a)(7) -- "colloquially known as the 'terrorism exception.'" *Kilburn*, 376 F.3d at 1126. In pertinent part, that exception abrogates the sovereign immunity of foreign states in civil cases "in which money damages are sought against a foreign state for personal injury or death that was caused by . . . extrajudicial killing." 28 U.S.C. § 1605(a)(7). "This exception applies only if three additional criteria are also satisfied: the foreign state was designated a 'state sponsor of terrorism' at the time the act occurred; the foreign state was given a reasonable opportunity to arbitrate a claim regarding an act that occurred within the state's borders; and the claimant or victim was a national of the United States." *Kilburn*, 376 F.3d at 1126-27 (citing 28 U.S.C. § 1605(a)(7)(A), (B)).

In this case, the district court correctly determined that it had jurisdiction over the plaintiff's suit under the terrorism exception of the FSIA. The assassination of Gholam Oveissi clearly qualifies as an extrajudicial killing attributable to the Iranian government; "Iran has been designated a state sponsor of terrorism continuously since January 19, 1984, one month prior to Gholam Ali Oveissi's death," *Oveissi*, 498 F. Supp. 2d at 275; there was no need to give Iran an opportunity to arbitrate the claim because the murder occurred outside Iran's borders; and the claimant, Amir Oveissi, is a U.S. citizen.

Although the FSIA grants jurisdiction over certain claims against foreign countries, at the time the plaintiff filed his suit the terrorism exception did not provide a federal cause of action against a foreign state. *See Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1027 (D.C. Cir. 2004). The plaintiff was therefore required to identify, and to bring his claims pursuant to, some other "cause of action arising out of a specific source of law" -- for example, state law. *Acree v. Republic of Iraq*, 370 F.3d 41, 59 (D.C. Cir. 2004), *abrogated on other grounds by*

*Republic of Iraq v. Beaty*, 129 S. Ct. 2183 (2009). While he did not have to identify the specific source of law in his complaint, the plaintiff did have to do so at an appropriate time in the litigation.[1] The plaintiff satisfied this obligation by identifying his causes of action as arising under state statutory and common law in his submissions to the district court.

One additional development in the statutory scheme merits notice. After the district court issued its opinion in this case, Congress enacted the National Defense Authorization Act for Fiscal Year 2008 (NDAA), which, among other things, amended the terrorism exception by repealing 28 U.S.C. § 1605(a)(7) and adding a new exception codified at § 1605A. Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-44 (2008). This new exception, which became effective on January 28, 2008, is "more advantageous to plaintiffs in several respects"; for example, it "creat[es] a federal right of action against foreign states, for which punitive damages may be awarded." *Simon v. Republic of Iraq*, 529 F.3d 1187, 1190 (D.C. Cir. 2008), *rev'd on other grounds sub nom. Republic of Iraq v. Beaty*, 129 S. Ct. 2183 (2009); *see* 28 U.S.C. § 1605A.

---

[1]*See Acree*, 370 F.3d at 43 (dismissing a suit because "[n]either appellees' complaint, nor their submissions to this court, nor the District Court's decision in their favor offers any . . . coherent alternative causes of action" besides the FSIA itself); *see also Kilburn*, 376 F.3d at 1125 (allowing a suit to proceed, "[a]lthough the complaint did not specify the legal sources of the . . . causes of action," when later pleadings clarified the sources of law underlying the claims); *cf. Owens v. Republic of Sudan*, 531 F.3d 884, 894 (D.C. Cir. 2008) (rejecting Sudan's argument that "heightened specificity is required of . . . pleading" regarding causation in an FSIA case, and noting that "Sudan points to no Rule or statute that imposes a heightened pleading requirement in the context of the terrorism exception").

In *Simon*, the circuit held that a "plaintiff in a case pending under § 1605(a)(7) may not maintain that action based upon the jurisdiction conferred by [the new] § 1605A; in order to claim the benefits of § 1605A, the plaintiff must file a new action under that new provision." 529 F.3d at 1192. We also determined, however, that "courts retain jurisdiction pursuant to [former] §1605(a)(7) over cases that were pending under that section when the Congress enacted the NDAA." *Id.* Because the plaintiff has not attempted to refile his case under § 1605A, we have no occasion to consider whether he can allege claims under that section. Instead, doing as *Simon* says, we retain jurisdiction and consider this suit pursuant to § 1605(a)(7), the section under which it was filed. *See La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya*, 533 F.3d 837, 845 (D.C. Cir. 2008); *Owens v. Republic of Sudan*, 531 F.3d 884, 887 (D.C. Cir. 2008).

## III

As noted in Part I, the district court dismissed the plaintiff's IIED claim on the ground that he lacked standing to assert such a claim under California law, and it dismissed his wrongful-death claim on the ground that it was barred by Lord Campbell's Act. Before we can consider whether the court accurately construed California law or Lord Campbell's Act, we must ask whether the district court was right to apply them. And before we can answer that question, we must first determine which jurisdiction's choice-of-law rules tell us which jurisdiction's substantive law to apply.

1. The FSIA does not contain an express choice-of-law provision. FSIA § 1606 does, however, provide that a foreign state stripped of its immunity "shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. This section ensures that, if

an FSIA exception abrogates immunity, plaintiffs may bring state law claims that they could have brought if the defendant were a private individual. *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 622 n.11 (1983) ("[W]here state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances."). In this way, "the FSIA . . . operates as a 'pass-through' to state law principles." *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 12 (2d Cir. 1996).

Relying on the language of § 1606, the Second Circuit has held that courts considering issues governed by state substantive law in FSIA cases should apply the choice-of-law rules of the forum state. *Barkanic v. Gen. Admin. of Civil Aviation of the People's Republic of China*, 923 F.2d 957, 959-60 (2d Cir. 1991); *see also O'Bryan v. Holy See*, 556 F.3d 361, 381 n.8 (6th Cir. 2009) (using the forum state's choice-of-law rules in an FSIA case). As the Second Circuit persuasively reasoned, "[t]he goal of applying identical substantive laws to foreign states and private individuals . . . cannot be achieved unless a federal court utilizes the same choice of law analysis in FSIA cases as it would apply if all the parties to the action were private." *Barkanic*, 923 F.2d at 959-60. The paradigm case involving choice-of-law issues and solely private parties is one brought under the federal courts' diversity jurisdiction. *See* 28 U.S.C. § 1332. In such a case, the court would apply the forum state's choice-of-law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). We thus agree with the Second Circuit that applying the forum state's choice-of-law principles, rather than constructing a set of federal common law principles, better effectuates Congress' intent that foreign states be "liable

in the same manner and to the same extent as a private individual" in FSIA actions.  28 U.S.C. § 1606.[2]

In this case, the plaintiff's causes of action for IIED and wrongful death are based solely on state substantive law, and the choice-of-law rules of the forum -- the District of Columbia -- therefore apply to those claims.  The district court did rely on D.C. law when conducting its choice-of-law analysis for the plaintiff's IIED claim, and it concluded that California law should supply the rule of decision. *See Oveissi*, 498 F. Supp. 2d at 280-81.  We review this determination *de novo*. *Williams v. First Gov't Mortgage & Investors Corp.*, 176 F.3d 497, 499 (D.C. Cir. 1999); *see also Felch v. Air Florida, Inc.*, 866 F.2d 1521, 1523 (D.C. Cir. 1989) ("This court treats choice of law issues as matters of law over which it exercises *de novo* review.").

2.  To determine which jurisdiction's substantive law governs a dispute, District of Columbia courts blend a "governmental interests analysis" with a "most significant relationship" test. *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 40-41 & n.18 (D.C. 1989); *see also Jaffe v. Pallotta TeamWorks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004); *Stephen A. Goldberg Co. v. Remsen Partners, Ltd.*, 170 F.3d

---

[2]By contrast, the Ninth Circuit has stated that, "[i]n the absence of specific statutory guidance [in the FSIA], [it] prefer[s] to resort to the federal common law for a choice-of-law rule." *Harris v. Polskie Linie Lotnicze*, 820 F.2d 1000, 1003 (9th Cir. 1987).  In our view, § 1606 provides sufficient statutory guidance to resolve the issue.  In any event, as we discuss in Part III.2, all of the usual choice-of-law factors -- including those identified as important by the Restatement (Second) of Conflict of Laws -- point in the same direction, so there is no reason to believe that applying a federal common law choice-of-law rule would yield a different result in this case.

191, 193-94 (D.C. Cir. 1999). "Under the governmental interests analysis[,] . . . [a court] must evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Hercules*, 566 A.2d at 41 (internal quotation marks omitted). To determine which jurisdiction has the most significant relationship to a case, a court must "consider the factors enumerated in the Restatement [(Second) of Conflict of Laws] § 145." *Id.* at 40. The four Restatement factors are: (1) "the place where the injury occurred"; (2) "the place where the conduct causing the injury occurred"; (3) "the domicil[e], residence, nationality, place of incorporation and place of business of the parties"; and (4) "the place where the relationship, if any, between the parties is centered." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2) (1971).

In any given case, these considerations may point in opposite directions and raise difficult questions concerning how each should be weighted. In this case, however, we face no such difficulty because the factors overwhelmingly point in the direction of France. The assassination occurred in France. The victim, Gholam Oveissi, was an Iranian who was domiciled there. Although the plaintiff is a U.S. citizen, he, too, was domiciled in France at the time his grandfather was murdered. Hence, this is not a case in which we must choose between applying the law of the jurisdiction where the tort occurred versus that where the plaintiff was domiciled, as both are the same. Moreover, in addition to having the most significant relationship to the assassination, France has a strong governmental interest in both deterring attacks within its sovereign borders and ensuring compensation for injuries to its

domiciliaries.[3] The interest of California, which arises solely out of the fact that the plaintiff was born and briefly resided there -- for less than a year and not at the time of the attack -- is slight by comparison. *Cf. Jaffee*, 374 F.3d at 1229 (concluding that District of Columbia choice-of-law rules counsel applying Virginia, rather than D.C., law to a suit brought on behalf of a D.C. resident when "Virginia has a public policy which is directly implicated" and "the interests of the District of Columbia are at best attenuated").

The district court recognized that, under ordinary D.C. choice-of-law analysis, French law would apply to the plaintiff's claims. *Oveissi*, 498 F. Supp. 2d at 280. The court noted, however, that "the United States has a unique interest in having its domestic law apply when its citizens are injured by state-sponsored terrorist acts." *Id.* at 281 (internal quotation marks omitted). This consideration, the court said, "elevates the interests of the United States to nearly [their] highest point" and requires resort to California law. *Id.* (internal quotation marks omitted).

To support this proposition, the district court cited another district court opinion, *Dammarell v. Islamic Republic of Iran*, which applied the law of the American plaintiffs' state of domicile -- rather than that of Lebanon -- to a suit brought by American victims of the 1983 bombing of the United States Embassy in Beirut. 2005 WL 756090 (D.D.C. Mar. 29, 2005).

---

[3] There is no contention here that application of French law would "conflict[] with a strong public policy" of the District of Columbia. *Cf. Sami v. United States*, 617 F.2d 755, 763 (D.C. Cir. 1979) (noting that "prevailing conflicts principles in the District of Columbia and elsewhere . . . permit application of an alternate substantive law when foreign law conflicts with a strong public policy of the forum" (footnote omitted)).

13

As the *Dammarell* court explained, the injuries in that case were "the result of a state-sponsored terrorist attack on a United States embassy and diplomatic personnel[, and the] United States has a unique interest in its domestic law . . . determining damages in a suit involving such an attack." *Id.* at \*20. The court cited the Restatement (Third) of Foreign Relations Law § 402(3), which provides that a country has jurisdiction to prescribe law with respect to "'certain conduct outside its territory by persons not its nationals *that is directed against* the security of the state or against a limited class of other state interests.'" *Id.* (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 402(3) (1987)) (emphasis added). The court also cited a comment to the Restatement for the proposition that this principle is "'increasingly accepted as applied to terrorist and other organized attacks *on a state's nationals by reason of their nationality*, or to assassination of a state's diplomatic representatives or other officials.'" *Id.* at \*20 n.16 (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 402 cmt. g) (emphasis added).

We have no doubt that the United States has a strong interest in applying its domestic law to terrorist attacks on its nationals, especially when, as was the case in *Dammarell*, the attacks are "by reason of their nationality." But Gholam Oveissi was not an American national; nor has the plaintiff suggested that the defendants knew Oveissi had an American grandchild or that the United States or its nationals were in any other way the object of the attack. To the contrary, plaintiff's counsel conceded at oral argument that there is no evidence that Oveissi's assassination was intended to affect the United States. *See* Oral Arg. Recording at 4:52-5:03. Moreover, the plaintiff's international terrorism expert testified that assassinations like this one "were intended to silence the Iranian regime's critics *and to deter French intervention in Lebanon.*" *Oveissi*, 498 F. Supp. 2d at 273 (emphasis added). Hence, if any country was

the object of the attack, it was France. Accordingly, all of the relevant choice-of-law factors point to the application of French law to the plaintiff's claims.[4]

We close this discussion by emphasizing that we are not setting forth a general choice-of-law rule for terrorism cases, but merely applying the District of Columbia's rules to the facts of a case filed under former § 1605(a)(7). And we note that, for terrorism cases filed under the new § 1605A, plaintiffs whose cases meet the statutory requirements now have a *federal* cause of action. *See* 28 U.S.C. § 1605A(c); *Simon*, 529 F.3d at 1190.

3. Having concluded that French law governs the assassination of French-domiciliary Gholam Oveissi in France, we do not address the plaintiff's arguments that the district court misconstrued California law and Lord Campbell's Act in dismissing his claims. We have no reason to suspect that French and California law are the same with respect to IIED claims. And we have every reason to doubt that France has adopted the equivalent of an 1846 British statute to govern wrongful-death claims in its courts. Accordingly, our opining on California law or Lord Campbell's Act would be beside the point. We leave it to the district court on remand to evaluate the plaintiff's claims under French law.

---

[4]We also note that, although choice-of-law rules can point to different sources of substantive law for different claims, *e.g.*, *Logan v. Providence Hosp., Inc.*, 778 A.2d 275, 280 (D.C. 2001), that is not the case for the closely related IIED and wrongful-death claims at issue here.

## IV

For the foregoing reasons, we reverse the judgment dismissing the plaintiff's amended complaint, and we remand the case for further proceedings consistent with this opinion.

*Reversed and remanded.*