(Slip Opinion) OCTOBER TERM, 2025 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## EXXON MOBIL CORP. *v.* CORPORACIÓN CIMEX, S. A. (CUBA), ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 24–699.　Argued February 23, 2026—Decided June 23, 2026

In 1960, after Fidel Castro seized power in Cuba, the Cuban Government confiscated many foreign-owned assets, including Exxon's oil refinery, terminals, packaging plants, and more than a hundred service stations.　Since then, two Cuban government-owned companies—Unión Cuba-Petróleo (CUPET) and Corporación CIMEX, S. A. (Cuba) (CIMEX)—have operated and profited from Exxon's expropriated assets.　Exxon had no good way to sue the Cuban government entities and seek compensation for its confiscated property until Congress passed and President Clinton signed the Helms-Burton Act in 1996. As relevant here, the Act created a private right of action for U. S. nationals whose property was confiscated by the Cuban Government against "any person that . . . traffics in" the confiscated property, 22 U. S. C. §6082(a)(1)(A), with "person" defined to include "any agency or instrumentality of a foreign state," §6023(11).　Exxon sued CUPET, CIMEX, and later CIMEX's Panamanian alter ego under the Helms-Burton Act in the U. S. District Court for the District of Columbia, seeking more than $1 billion in damages.　The Cuban government-owned companies moved to dismiss, asserting immunity under the generally applicable Foreign Sovereign Immunities Act (FSIA).　Exxon countered that the Helms-Burton Act itself waived the defendants' sovereign immunity.　The District Court sided with the Cuban government defendants, and a divided panel of the U. S. Court of Appeals for the D. C. Circuit affirmed.　111 F. 4th 12, 23.

*Held*: The Helms-Burton Act itself abrogates the sovereign immunity of Cuban agencies and instrumentalities; plaintiffs who sue Cuban agencies or instrumentalities under the Act need not also satisfy one of

FSIA's enumerated exceptions to foreign sovereign immunity.

A congressional waiver of sovereign immunity must be "clearly discernible from the sum total" of Congress's "work," *Department of Agriculture Rural Development Rural Housing Service* v. *Kirtz*, 601 U. S. 42, 55. Four points, taken together, lead to the conclusion that the Helms-Burton Act clearly abrogated the foreign sovereign immunity of Cuban agencies and instrumentalities. Pp. 5–22.

(a) First, under this Court's precedents, a statute creating a cause of action that explicitly applies against a sovereign waives the immunity of that sovereign "even without a separate waiver provision," *id.*, at 53. The Helms-Burton Act's cause of action expressly applies against Cuban agencies and instrumentalities: Section 6082(a)(1)(A) confers a private right of action for any U. S. national whose "property" was "confiscated by the Cuban Government," running against "any person that . . . traffics in" the confiscated property, and Section 6023(11) defines "person" to include "any agency or instrumentality of a foreign state." This Court's general sovereign immunity precedents—most recently *Kirtz*—hold that when Congress creates a cause of action and expressly applies it against government agencies or instrumentalities, Congress has abrogated sovereign immunity, see *id.*, at 49–50. Pp. 8–11.

(b) Second, Congress does not ordinarily enact self-defeating statutes, see *Quarles* v. *United States*, 587 U. S. 645, 654, or "authorize a suit against a sovereign with one hand, only to bar it with the other," *Financial Oversight and Management Bd. for P. R.* v. *Centro De Periodismo Investigativo, Inc.*, 598 U. S. 339, 348. The Cuban government defendants' interpretation would largely negate the Helms-Burton Act's cause of action because the potentially relevant FSIA exceptions—the expropriation exception, 28 U. S. C. §1605(a)(3), and the commercial-activity exception, §1605(a)(2)—would require a plaintiff to demonstrate that the Cuban instrumentalities engaged in commercial activity *in the United States* or committed acts with direct effects *in the United States.* But a plaintiff suing under the Helms-Burton Act could almost never meet those exceptions because the Act simultaneously codified a comprehensive economic embargo against Cuba and barred most commercial interactions between Americans and Cubans. See 22 U. S. C. §6032(h); see, *e.g.*, 31 CFR §§515.201(b), 515.204. Pp. 11–13.

(c) Third, the Helms-Burton Act provides that suits under the Act fall within the general federal-question jurisdiction of 28 U. S. C. §1331, not under the FSIA's §1330. Title 22 U. S. C. §6082(c)(1) states that Title 28's provisions apply to suits under the Act "to the same extent as . . . *any other action* brought under section 1331 of title 28." (Emphasis added.) By making suits under the Helms-Burton Act

Syllabus

subject to §1331 rather than §1330, Congress made clear that actions under the Act are not actions under the FSIA.  Pp. 13–15.

   (d) Fourth, the Helms-Burton Act grants the President plenary power to suspend suits under the Act based on current national security and foreign policy assessments, operating similarly to how foreign sovereign immunity operated before the 1976 enactment of the FSIA. Under both the Act and the pre-FSIA immunity regime, immunity decisions were the province of the Executive Branch.  It is not plausible to conclude that Congress chose to reinstate the pre-FSIA immunity regime in the Helms-Burton Act while simultaneously subjecting suits under the Act to the FSIA.  Pp. 15–18.

   (e) The Cuban government defendants' counterarguments fail.  The implied-repeal canon does not apply because the Helms-Burton Act contains many *express* indications that the Act is a standalone statutory exception to foreign sovereign immunity.  And contrary to the Cuban government defendants' arguments, Congress does not need to use "magic words" to abrogate sovereign immunity, *Kirtz*, 601 U. S., at 48; Congress must simply make a waiver "clearly discernable" from the "sum total" of its work, *id.*, at 55 (quotation marks omitted), which the Helms-Burton Act did through its many provisions indicating that Cuban agencies and instrumentalities could and would be sued.  That an earlier draft of the Helms-Burton Act expressly waived sovereign immunity while the final version did not is simply another magic-words requirement.  Pp. 18–21.

111 F. 4th 12, reversed and remanded.

   KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, GORSUCH, and BARRETT, JJ., joined.  KAGAN, J., filed a dissenting opinion, in which SOTOMAYOR and JACKSON, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 24–699

EXXON MOBIL CORPORATION, PETITIONER *v.* CORPORACIÓN CIMEX, S. A. (CUBA), ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 23, 2026]

JUSTICE KAVANAUGH delivered the opinion of the Court.

In 1960, a year after assuming power in Cuba, Fidel Castro declared that the new Communist government would seize all "Yankee property" in Cuba. Castro made good on that promise. The Cuban Government confiscated a variety of American businesses then operating in Cuba, including Exxon's oil refinery and service stations. Cuba transferred Exxon's property to Cuban government-owned companies.

In 1996, to afford victims of "Castro's wrongful seizures" a "judicial remedy in the courts of the United States," Congress passed and President Clinton signed the Helms-Burton Act, formally known as the Cuban Liberty and Democratic Solidarity Act. §301, 110 Stat. 815, 22 U. S. C. §6081. That Act created a private right of action for U. S. nationals whose property was unlawfully confiscated: They may sue Cuban agencies and instrumentalities that possess, use, or otherwise traffic in the confiscated property.

Foreign sovereigns, including their agencies and instrumentalities, are presumptively immune from suit in U. S. courts. The question here is whether the Helms-

Burton Act abrogates the foreign sovereign immunity of Cuban agencies and instrumentalities—or whether plaintiffs such as Exxon suing under the Act must also satisfy one of the exceptions to immunity in the generally applicable Foreign Sovereign Immunities Act of 1976, or FSIA. 90 Stat. 2891, 28 U. S. C. §§1330, 1602 *et seq.*

We conclude that the Helms-Burton Act itself abrogates the sovereign immunity of Cuban agencies and instrumentalities. Therefore, plaintiffs who sue Cuban agencies or instrumentalities under the Act are not required to also satisfy an FSIA exception.

I

In the first half of the 1900s, American businesses invested heavily in Cuba's economy. Exxon Mobil Corporation (Exxon), then known as Standard Oil, maintained an active presence in Cuba: It owned and operated an oil refinery, terminals, packaging plants, and more than a hundred service stations.

In 1959, Fidel Castro seized power in Cuba, ushering in Communist control that continues to this day. In the wake of Castro's takeover, the Cuban Government confiscated many foreign-owned assets.

As relevant here, Castro's regime confiscated Exxon's refinery, terminals, plants, and service stations. Since then, two Cuban government-owned companies, Unión Cuba-Petróleo (CUPET) and Corporación CIMEX S. A. (Cuba) (CIMEX), have operated and profited from Exxon's expropriated assets.

In 1969, pursuant to its statutory mandate to determine the validity and size of U. S. nationals' claims against the Cuban Government, the U. S. Foreign Claims Settlement Commission certified the value of Exxon's claim for confiscated property at more than $70 million. See International Claims Settlement Act of 1949, ch. 54, §1, 64 Stat. 12, 22 U. S. C. §1621 *et seq.* With prejudgment

interest and statutory treble damages, that figure now exceeds $1 billion.

For decades afterwards, Exxon had no good way to sue the Cuban government entities and seek compensation for its confiscated property. Things started to change in 1996, when Cuba shot down two unarmed private planes in international airspace, killing three American citizens. That incident generated outrage in the United States, and soon thereafter, Congress passed and President Clinton signed the Cuban Liberty and Democratic Solidarity Act. 110 Stat. 785, 22 U. S. C. §6021 *et seq.* That Act is commonly known as the Helms-Burton Act after its principal congressional sponsors, Senator Jesse Helms and Representative Dan Burton.

The Act codified the longstanding American economic embargo against Cuba and otherwise increased sanctions and pressure on the Castro regime. §6032(h); see, *e.g.*, §6034.

The Act also created a new private right of action for any U. S. national who "owns the claim" to "property which was confiscated by the Cuban Government on or after January 1, 1959." §6082(a)(1)(A). The right of action runs against "any person that . . . traffics in" the confiscated property. *Ibid.* The Act expansively defines "person" as "any person or entity, including any agency or instrumentality of a foreign state." §6023(11).

The Act likewise defines trafficking broadly. A Cuban agency or instrumentality "traffics" in confiscated property if, among other things, it "knowingly and intentionally": "sells, transfers, [or] distributes" the property; "purchases, leases, receives, [or] possesses" an interest in the property; "engages in a commercial activity using or otherwise benefiting from" the property; or "causes, directs, participates in, or profits from" such trafficking. §6023(13).

Importantly, the Helms-Burton Act grants the President plenary gatekeeping power over whether lawsuits under

the Act can proceed in court. Section 6085(c)(1)(B) authorizes the President to "suspend the right to bring an action . . . with respect to confiscated property" for six months at a time "if the President determines . . . that such suspension is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba." See also §§6085(b), 6085(c)(2), 6082(h)(1), 6064(a) (conferring additional suspension authorities on the President).

From 1996 until 2019, Presidents Clinton, Bush, Obama, and Trump continuously exercised the Act's suspension authority, thereby preventing suits under the Helms-Burton Act from moving forward in U. S. courts.

On May 2, 2019, President Trump's Administration ended the longstanding suspension. The Secretary of State announced: "Detente with the regime has failed." Press Release, Michael R. Pompeo, Secretary of State, Remarks to the Press (Apr. 17, 2019). And he explained that "holding the Cuban Government accountable for seizing American assets" was the United States' new policy toward Cuba. *Ibid.*

That same day, in the U. S. District Court for the District of Columbia, Exxon sued various Cuban government-owned companies: CUPET, CIMEX, and later also CIMEX's Panamanian alter ego, Corporación CIMEX S. A. (Panama). Exxon alleged that CUPET and CIMEX had seized Exxon's Cuban operations and used Exxon's refinery, terminals, plants, and service stations to produce, refine, and sell oil and gas. Exxon sought more than $1 billion, reflecting the value of its Commission-certified claim, prejudgment interest, and statutory treble damages.

The Cuban government-owned companies moved to dismiss. As wholly owned instrumentalities of Cuba, they asserted immunity under the Foreign Sovereign Immunities Act and argued that Exxon had not satisfied any of the FSIA's enumerated exceptions to foreign

sovereign immunity.  90 Stat. 2891, 28 U. S. C. §§1330, 1602 *et seq.*  Exxon countered that the Helms-Burton Act itself waived the Cuban government defendants' sovereign immunity by creating a cause of action that expressly applied against foreign agencies and instrumentalities.  See §§6082(a)(1)(A), 6023(11).  According to Exxon, it did not need to also satisfy an FSIA exception to foreign sovereign immunity.

The District Court sided with the Cuban government defendants.  534 F. Supp. 3d 1 (2021).  A divided panel of the U. S. Court of Appeals for the D. C. Circuit affirmed in relevant part, concluding that the Helms-Burton Act "harmoniously coexists with the FSIA."  111 F. 4th 12, 23 (2024).  The court ruled that Exxon therefore was required to show that its suit fell within one of the FSIA's exceptions.

Judge Randolph dissented.  In his view, the Helms-Burton Act "established a specific, independent, and exclusive cause of action" that "considered alone, deprives the Cuban defendants of immunity from suit."  *Id.*, at 37, 39 (emphasis deleted).

In light of the importance of the issue to the Nation's foreign policy interests, this Court granted certiorari.  606 U. S. 1065 (2025).

## II
## A

Historically, U. S. courts applied foreign sovereign immunity as a common-law doctrine.  In the years preceding 1952, for the most part, this meant U. S. courts deferred to the State Department on whether a foreign sovereign was immune from suit.

In practice, foreign sovereigns that were sued in U. S. courts could seek a "suggestion of immunity" from the State Department.  *Samantar* v. *Yousuf*, 560 U. S. 305, 311 (2010) (quotation marks omitted).  The State Department usually acquiesced in those requests from friendly sovereigns.  And

the courts in turn followed the State Department's lead by affording common-law immunity to those sovereigns. See, *e.g.*, *Ex parte Peru*, 318 U. S. 578, 588 (1943) ("[C]ourts are required to accept and follow the executive determination that the vessel is immune"); see *Samantar*, 560 U. S., at 311–312 (explaining pre-FSIA practice); *Republic of Argentina* v. *NML Capital, Ltd.*, 573 U. S. 134, 140 (2014).

In 1952, the State Department adopted what is known as the "restrictive" theory of foreign sovereign immunity. See *Turkiye Halk Bankasi A.S.* v. *United States*, 598 U. S. 264, 271 (2023). Courts continued to defer to the State Department, but the State Department would support immunity only for a foreign sovereign's public acts and not for its strictly commercial acts.

The restrictive theory "proved troublesome" in practice. *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 487 (1983). Under that regime, foreign governments placed substantial diplomatic and political pressure on the State Department. That pressure often led to inconsistent State Department positions, which in turn exacerbated tensions with foreign nations. See *Turkiye Halk Bankasi*, 598 U. S., at 271–272.

In 1976, Congress intervened. To ensure more consistency, reduce international friction, and mitigate some of the Executive Branch's difficulties in dealing with immunity requests from foreign nations, Congress passed and President Ford signed the Foreign Sovereign Immunities Act, or FSIA. 90 Stat. 2891.

The FSIA establishes a "baseline principle of immunity for foreign states and their instrumentalities." *Turkiye Halk Bankasi*, 598 U. S., at 272 (citing 28 U. S. C. §1604). In particular, under the FSIA, courts lack subject-matter jurisdiction over suits against a foreign state, or against its agencies or instrumentalities, unless an enumerated exception applies. See *CC/Devas (Mauritius) Ltd.* v. *Antrix Corp.*, 605 U. S. 223, 234 (2025); 28 U. S. C. §§1330(a),

1605–1607.   And the FSIA transferred "primary responsibility for deciding claims of foreign states to immunity from the State Department to the courts." *Samantar*, 560 U. S., at 313 (quotation marks omitted).

For present purposes, two FSIA exceptions are relevant. The first, the commercial activity exception, allows suits against foreign sovereigns, including their agencies and instrumentalities, based on "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere" when the act at issue "causes a direct effect in the United States." §1605(a)(2).  We will come back to that exception below; for now, note that it requires a plaintiff to show that the foreign agency's or instrumentality's allegedly unlawful act caused a direct effect *in the United States*.

The second, the expropriation exception, allows suits against foreign sovereigns, including their agencies and instrumentalities, when property rights "taken in violation of international law are in issue"; the property "is owned or operated by an agency or instrumentality" of the expropriating sovereign; and the agency or instrumentality "is engaged in a commercial activity in the United States." §1605(a)(3).  We will also come back to that exception below; for now, note that it requires a plaintiff to show that the foreign agency or instrumentality is engaged in a commercial activity *in the United States*.

B

Time did not stop in 1976 when Congress enacted the FSIA.  And one Congress cannot bind another—meaning that a later Congress always may repeal or modify an old law, or enact a new law that is exempt from the old law.  In 1996, when Congress passed the Helms-Burton Act, Congress was free to directly abrogate the foreign sovereign immunity of Cuban agencies and instrumentalities, thereby overriding the FSIA.  See *Bank Markazi* v.

*Peterson*, 578 U. S. 212, 236 (2016) ("it remains Congress' prerogative to alter a foreign state's immunity"). Exxon argues that Congress did precisely that when it enacted the Helms-Burton Act.

We agree with Exxon. Four points, taken together, lead to that conclusion.

*First*, the Helms-Burton Act's cause of action expressly applies against Cuban agencies and instrumentalities. Under this Court's precedents, such statutory language signals that Congress waived sovereign immunity. *Second*, the Act explicitly contemplated that the cause of action would supply a meaningful remedy against Cuban agencies and instrumentalities. But applying the FSIA would largely negate the cause of action. A plaintiff could not readily satisfy the FSIA's only potentially relevant exceptions—the commercial activity or expropriation exceptions—because those exceptions require direct effects or commercial activity in the United States. And in light of the Helms-Burton Act's simultaneous embargo prohibiting American commercial activity with Cuba, that showing would be difficult if not impossible for a plaintiff to make. *Third*, the Act provides that subject-matter jurisdiction for Helms-Burton Act suits lies under the federal-question statute (28 U. S. C. §1331) rather than under the FSIA (§1330). The jurisdictional provision therefore reinforces the conclusion that the FSIA does not apply to suits under the Helms-Burton Act. *Fourth*, the Act grants the President plenary power to suspend suits under the Act when doing so is in America's national security or foreign policy interests. The President's statutorily assigned gatekeeping authority over suits against Cuban agencies and instrumentalities tracks the pre-FSIA foreign sovereign immunity regime rather than the FSIA's approach—yet another sign that the FSIA does not apply here.

In short, as we will now explain in more detail, the entire architecture of the Helms-Burton Act establishes that the Act waives the foreign sovereign immunity of Cuban agencies and instrumentalities, and does not require Exxon to also satisfy one of the FSIA's exceptions to foreign sovereign immunity.

1

A congressional waiver of sovereign immunity must be "clearly discernible from the sum total" of Congress's "work." *Department of Agriculture Rural Development Rural Housing Service* v. *Kirtz*, 601 U. S. 42, 55 (2024) (quotation marks omitted). In other words, Congress must make its waiver "unmistakably clear in the language of the statute." *Id.*, at 49 (quotation marks omitted). Under this Court's precedents, a statute creating a cause of action that explicitly applies against a sovereign waives the immunity of that sovereign, "even without a separate waiver provision." *Id.*, at 53.

Here, the Helms-Burton Act's cause of action expressly applies against Cuban agencies and instrumentalities. Specifically, §6082(a)(1)(A) explicitly confers a private right of action for any U. S. national whose "property" was "confiscated by the Cuban Government." The cause of action runs against "any person that . . . traffics in" the confiscated property. 22 U. S. C. §6082(a)(1)(A). As relevant here, §6023(11) in turn defines "person" to include "any agency or instrumentality of a foreign state."

This Court's general sovereign immunity precedents— most recently *Kirtz*—hold that when, as here, Congress creates a cause of action and expressly applies the cause of action against government agencies or instrumentalities, Congress has abrogated sovereign immunity. See 601 U. S., at 49–50; see also *Kimel* v. *Florida Bd. of Regents*, 528 U. S. 62, 73–74 (2000); *Nevada Dept. of Human Resources* v. *Hibbs*, 538 U. S. 721, 726 (2003); *Financial Oversight and*

*Management Bd. for P. R.* v. *Centro De Periodismo Investigativo, Inc.*, 598 U. S. 339, 347–348 (2023) (FOMB).

Here, like in *Kirtz*, the Helms-Burton Act "creates a cause of action." 601 U. S., at 49 (quotation marks omitted); §6082(a)(1)(A). Check. And here, like in *Kirtz*, the Helms-Burton Act "explicitly authorizes suit against a government on that claim" by defining "person" to include an "agency or instrumentality of a foreign state." 601 U. S., at 49. (quotation marks omitted); §6023(11). Again, check.

But what about the FSIA? Must a plaintiff suing under the Helms-Burton Act also satisfy one of the FSIA's enumerated exceptions to foreign sovereign immunity?

In the ordinary course, the FSIA applies when a plaintiff seeks to sue a foreign sovereign under a *general* federal or state cause of action. See, *e.g.*, *Argentine Republic* v. *Amerada Hess Shipping Corp.*, 488 U. S. 428, 435–436, 438 (1989) (suit under the Alien Tort Statute must satisfy the FSIA). In those circumstances, the FSIA's default presumption of immunity and its enumerated exceptions do important work. After all, when Congress creates a general cause of action, it is not evident that Congress contemplates or intends that plaintiffs suing under that general cause of action could hale foreign sovereigns into U. S. court. In such a case, therefore, the FSIA governs which suits can go forward against foreign sovereigns.

But the Helms-Burton Act is entirely different. Congress took the highly unusual step of creating a cause of action that expressly applies against foreign (here, Cuban) agencies and instrumentalities. Only a few other laws in the U. S. Code create a cause of action that expressly applies against a foreign sovereign or its agencies and instrumentalities. See Tr. of Oral Arg. 14–15 (referencing the handful of statutes that authorize actions against foreign agencies and instrumentalities); Pet. for Cert. 30; cf., *e.g.*, 22 U. S. C. §§8102(11), 8141–8142, 6701(6), 6726, 6761(a)(1)(A); 21 U. S. C. §§2312–2314.

In short, the Helms-Burton Act's uncommon cause of action, with its explicit application against foreign agencies and instrumentalities, strongly indicates that the Act itself waives the foreign sovereign immunity of Cuban agencies and instrumentalities and that a plaintiff need not also satisfy an FSIA exception.

But we need not rest on the cause of action alone because several other features of the Helms-Burton Act confirm that conclusion.

2

Congress does not ordinarily enact self-defeating statutes. See *Quarles* v. *United States*, 587 U. S. 645, 654 (2019). And more specifically, Congress does not ordinarily "authorize a suit against a sovereign with one hand, only to bar it with the other." *FOMB*, 598 U. S., at 348. But the Cuban government defendants' interpretation of the Helms-Burton Act would do just that and largely negate the Act's cause of action.

That is because the defendants would require suits under the Act to also satisfy an FSIA exception. In turn, the potentially relevant FSIA exceptions would require a plaintiff such as Exxon to demonstrate that the Cuban instrumentalities engaged in commercial activity *in the United States* or, as part of their commercial activity elsewhere, committed acts that had direct effects *in the United States*. See 28 U. S. C. §§1605(a)(2)–(3).

But a plaintiff suing under the Helms-Burton Act could almost never meet those exceptions because the Act simultaneously codified a comprehensive economic embargo against Cuba and barred most commercial interactions between Americans and Cubans. See 22 U. S. C. §6032(h); see, *e.g.*, 31 CFR §§515.201(b), 515.204 (2025).

Requiring a plaintiff to satisfy an FSIA exception would therefore eviscerate the cause of action. So it follows that

requiring a plaintiff to satisfy an FSIA exception cannot be the correct interpretation of the Helms-Burton Act. After all, we know that Congress not only created an express cause of action against Cuban agencies and instrumentalities but also viewed the cause of action as a powerful remedy: The Act contains numerous other Cuba-specific references that assume the existence of actual suits and judgments against Cuban agencies and instrumentalities. For instance, §6064(a) authorizes the suspension of "actions" "filed against the Cuban Government." Section 6082(d) limits the enforceability of "any judgment against an agency or instrumentality of the Cuban Government" when there is a democratically elected or transition government in Cuba. And §6082(a)(7)(B) clarifies that "any claim against the Cuban Government" is not subject to the Act's embargo provisions.

A "claim" or "action" "filed against the Cuban Government" anticipates plaintiffs suing Cuban agencies and instrumentalities. §§6082(a)(7)(B), 6064(a). A "judgment against an agency or instrumentality of the Cuban Government" contemplates plaintiffs suing those Cuban government entities and reaching a final disposition—not having their suit dismissed on sovereign immunity grounds. §6082(d). None of those references would make any sense if the FSIA applied and suits under the Helms-Burton Act could never (or almost never) make it out of the starting blocks.[1]

_____

[1] The Cuban government defendants object that the embargo is not 100 percent airtight and that applying the FSIA to suits under the Helms-Burton Act would therefore not render the Act's cause of action a dead letter. That argument is misplaced. It does nothing to rebut the point that a Congress embargoing nearly all American commercial activity with Cuba would not have made the new cause of action against Cuban agencies and instrumentalities depend on a commercial nexus between the United States and Cuba.

It would be odd to read the Act as an empty threat against Cuba given that Congress, in the text of the Act, deliberately "endowed" U. S. nationals "with a judicial remedy in the courts of the United States." §6081(11). In the Act, Congress repeatedly decried the unlawful taking and continued exploitation of property by the Castro regime. §§6081(2), (3), (5), (6). And Congress supplied U. S. nationals with a cause of action because the "international judicial system, as currently structured, lacks *fully effective remedies* for the wrongful confiscation of property and for unjust enrichment from the use of wrongfully confiscated property by governments." §6081(8) (emphasis added).

As the U. S. Government aptly explained at oral argument, applying the FSIA to suits under the Helms-Burton Act would create a "gross mismatch" because Cuban agencies and instrumentalities were the Helms-Burton Act's "main culprits." Tr. of Oral Arg. 39. It would make little sense for Congress to construct an elaborate statute authorizing suits against the Cuban government agencies and instrumentalities if, because of the FSIA, almost no suits could ever get through the courthouse door.

3

In addition to the Helms-Burton Act's explicit cause of action against Cuban agencies and instrumentalities, as well as the fact that applying the FSIA to suits under the Act would largely negate the express cause of action, the Act provides that suits under the Act fall within the general federal-question jurisdiction of 28 U. S. C. §1331.

Section 6082(c)(1) of Title 22 states: "Except as provided in this subchapter," Title 28's provisions apply to suits under the Act "to the same extent as . . . *any other action* brought under section 1331 of title 28." (emphasis added). In other words, a suit under the Helms-Burton Act is the same as "any other" federal-question suit under §1331. And §1331 allows civil actions to proceed in federal court

whenever they arise "under the Constitution, laws, or treaties of the United States."

Why does that matter? Because a suit under the FSIA is *not* a federal-question suit. Suits subject to the FSIA are governed by 28 U. S. C. §1330, which affords district courts original jurisdiction over civil actions against foreign states—provided that the suit qualifies under one of the FSIA's exceptions. So ordinarily, a federal district court possesses jurisdiction over a suit against a foreign state, agency, or instrumentality only if a plaintiff invokes an FSIA exception. But §1331 contains no such threshold requirement.

By making suits under the Helms-Burton Act subject to §1331 rather than §1330, Congress made clear that actions under the Helms-Burton Act are not actions under the FSIA.

Moreover, it is not as if Congress, when enacting the Helms-Burton Act, somehow forgot that the FSIA and §1330 existed. The next provision of the Helms-Burton Act, 22 U. S. C. §6082(c)(2), borrows the FSIA's rules as to the method of serving process "on an agency or instrumentality of a foreign state." See also §§6023(1), (3) (borrowing definitions from the FSIA). Those service-of-process rules define when a court may exercise personal jurisdiction over a foreign agency or instrumentality. See 28 U. S. C. §1330(b). Congress's selective and explicit incorporation of the FSIA's service-of-process provisions into the Helms-Burton Act reinforces the conclusion that the FSIA does not generally apply to the Act. If the FSIA *did* apply, there would have been no need for the service-of-process provision in 22 U. S. C. §6082(c)(2). See 111 F. 4th, at 41 (Randolph, J., dissenting).

The Cuban government defendants respond that §6082(c) is titled "[p]rocedural requirements"—not "jurisdictional requirements." But that observation does not change the substance of §§6082(c)(1) and (c)(2): §6082(c)(1) addresses

subject-matter jurisdiction, and §6082(c)(2) addresses service-of-process rules for foreign agencies and instrumentalities—that is, how to obtain personal jurisdiction over those foreign government entities.

And more fundamentally, a contrary reading would read "other" out of the statute because §6082(c)(1) says that a suit under the Helms-Burton Act is the same as "any other" federal-question suit under 28 U. S. C. §1331.[2]

So §§6082(c)(1) and (c)(2) are best read as addressing subject-matter and personal jurisdiction in suits against Cuban agencies and instrumentalities. Together, §§6082(c)(1) and (c)(2) further confirm that suits under the Helms-Burton Act are not governed by the FSIA.

4

And lest there be any remaining doubt, the Helms-Burton Act grants the President plenary power to suspend suits under the Act based on current national security and foreign policy assessments. The Presidential suspension provisions operate similarly to how foreign sovereign immunity operated in the years before the 1976 enactment of the FSIA—that is, with foreign sovereign immunity decisions the province of the Executive Branch.

Many provisions of the Helms-Burton Act authorize the President to suspend or permit suits under the Act. Most relevant is §6085(c)(1)(B), which empowers the President to

_____

[2] The dissent says that "Congress's reference to §1331 makes perfect sense" because most suits under the Helms-Burton Act will be brought against private parties, not Cuban agencies or instrumentalities. *Post*, at 10 (opinion of KAGAN, J.). That observation, however, does not explain §6082(c)(2)'s explicit borrowing of the FSIA's service-of-process rules. If Congress was aware enough to provide service-of-process rules applicable in the subset of suits against foreign agencies or instrumentalities, why did Congress decline to make a similar clarification in §6082(c)(1) with respect to subject-matter jurisdiction if it intended for suits against Cuban agencies and instrumentalities to fall under §1330 of the FSIA?

"suspend the right to bring an action . . . with respect to confiscated property" for six-month periods if the President determines and reports that the "suspension is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba." Section 6085(c)(2) authorizes additional six-month suspensions. Section 6064(a) likewise authorizes the President "to suspend the right of action . . . with respect to actions thereafter filed against the Cuban Government." And §6085(d) allows the President to "rescind any suspension" in order to "expedite a transition to democracy in Cuba."

Therefore, suits under the Helms-Burton Act may proceed only if the President chooses to allow them—or, more precisely, not to disallow them. And the President's statutorily authorized discretion over whether to allow such suits is constrained only by his obligation to determine and report to Congress his conclusion that a suspension is in the national interest and would further a democratic transition in Cuba, or that a transition government has taken power. See §§6064(a), 6082(d), (h)(1)(B), 6085(c)(1)(B).

The bottom line is that the Helms-Burton Act, with respect to suits against Cuban agencies and instrumentalities, establishes a version of the immunity system in place before the FSIA. Recall that the old regime of Executive Branch immunity decisionmaking essentially allowed the State Department (under the direction of the President) to make the immunity call. In 1976, the FSIA then transferred "primary responsibility for deciding 'claims of foreign states to immunity' from the State Department to the courts." *Samantar*, 560 U. S., at 313 (quoting 28 U. S. C. §1602).

It is not plausible to conclude that Congress, in the Helms-Burton Act, in essence reinstated the pre-FSIA immunity regime while simultaneously subjecting suits under the Act to the FSIA—particularly given that few if any suits against Cuban agencies and instrumentalities

could ever clear the FSIA's hurdles. In other words, after the President has determined that suits under the Helms-Burton Act should proceed, requiring those suits to satisfy the FSIA—under which the suit would usually be disallowed by federal judges—would badly undermine Congress's design and thwart the President's statutorily authorized assessment of current developments in Cuba.

What sense would that make? Why craft numerous provisions granting gatekeeping power to the President if very few (if any) suits would satisfy one of the FSIA's exceptions? Involving the President in such a manner would make little sense unless (as is the case) Congress displaced the FSIA for suits against Cuban agencies and instrumentalities.

This Court's precedents further support reading the Helms-Burton Act to displace the FSIA's immunity regime. In *Republic of Iraq* v. *Beaty*, the relevant statute afforded the President the power to "make inapplicable with respect to Iraq . . . any other provision of law that applies to countries that have supported terrorism." 556 U. S. 848, 856 (2009) (quotation marks omitted). The statute in *Beaty* did not speak explicitly to sovereign immunity, to suits against foreign sovereigns, or to the FSIA. This Court nonetheless concluded that the "any other provision of law" residual clause authorized the President to suspend the FSIA's exception for state sponsors of terrorism, thereby reinstating Iraq's foreign sovereign immunity. See *id.*, at 866. The Helms-Burton Act establishes a similar grant of on-off authority over foreign sovereign immunity to the President.[3]

—————

[3] The dissent points out that the Presidential suspension provisions empower the President to stop all suits under the Helms-Burton Act— not just those against Cuban agencies or instrumentalities. See *post*, at 10. But the fact that the Act sweeps broader does not affect the critical point: As applied to suits against Cuban agencies and instrumentalities,

To summarize: The Helms-Burton Act "afford[s] the President"—not the courts—the "flexibility" to confront "unique circumstances" that can arise in the foreign affairs realm with respect to Cuba. *Id.*, at 857. After the President has allowed suits under the Act to go forward, there is no additional FSIA hurdle that a plaintiff must clear in order to sue Cuban agencies or instrumentalities.

\*     \*     \*

The "sum total" of the Helms-Burton Act's work clearly abrogates the foreign sovereign immunity of Cuban agencies and instrumentalities and displaces the FSIA's default sovereign immunity regime. *Kirtz*, 601 U. S., at 55. The Helms-Burton Act authorizes private suits against Cuban agencies and instrumentalities—suits that would largely be nonstarters if subjected to the FSIA's requirements. 22 U. S. C. §§6082(a)(1)(A), 6023(11). The Act expressly refers to claims, actions, and judgments against the Cuban Government. §§6064(a), 6082(d), (a)(7)(B). The Act treats suits under the Act as falling within federal-question jurisdiction, unlike suits under the FSIA. §6082(c)(1). And the Act expressly reinstates the President as gatekeeper for those suits, akin to the pre-FSIA regime. §§6064(a), 6082(d), (h)(1)(B), 6085(b), (c)(1)(B).[4]

### III

The Cuban government defendants offer a few counterarguments.

*First*, they invoke the canon against implied repeal. They say that the Helms-Burton Act can supersede the FSIA only

---

the suspension provisions authorize the President to make the *de facto* immunity determination.

[4] This case does not present, and this opinion therefore does not address, the question whether the Helms-Burton Act also abrogates the foreign sovereign immunity of other countries' agencies or instrumentalities.

if the two Acts "'irreconcilabl[y] conflict.'" Brief for Respondents 20 (quoting *Carcieri* v. *Salazar*, 555 U. S. 379, 395 (2009)). And because some small subset of suits under the Act *might* satisfy the FSIA's exceptions, they claim that there is no irreconcilable conflict.

But the implied-repeal canon does not apply here because the Helms-Burton Act contains many *express* indications that the Act is a standalone statutory exception to foreign sovereign immunity. The Helms-Burton Act *expressly* authorizes suits against Cuban agencies and instrumentalities, *expressly* contemplates claims, actions, and judgments against the Cuban government entities, *expressly* identifies 28 U. S. C. §1331 (not §1330) as the source of jurisdiction, and *expressly* grants the President authority to suspend or permit suits under the Act irrespective of whether those suits satisfy an FSIA exception.

*Second*, the Cuban government defendants draw on language from this Court's precedents describing the FSIA as the "sole basis for obtaining jurisdiction over a foreign state in federal court." *Argentine Republic* v. *Amerada Hess Shipping Corp.*, 488 U. S. 428, 439 (1989).

But as the Court later explained in another FSIA case, "general language in judicial opinions" does not control "quite different circumstances that the Court was not then considering." *Turkiye Halk Bankasi A.S.* v. *United States*, 598 U. S. 264, 278 (2023) (quotation marks omitted). More to the point, the FSIA (and this Court's descriptions of the FSIA) could not and did not preclude Congress from enacting a later exception to foreign sovereign immunity. See *Bank Markazi* v. *Peterson*, 578 U. S. 212, 236 (2016). And here, 22 U. S. C. §6082(c)(1) says that the FSIA is *not* the basis of jurisdiction for suits under the Helms-Burton Act—let alone the sole basis. Section 1331 of Title 28, the general federal-question statute, is the source of jurisdiction.

*Third*, the Cuban government defendants (and the dissent) assert that Congress could have more clearly displaced the FSIA if it wanted to do so. It is true that Congress could have of course "address[ed] the question" of foreign sovereign immunity "in different and arguably even more obvious terms." *Department of Agriculture Rural Development Rural Housing Service* v. *Kirtz*, 601 U. S. 42, 51 (2024). But this Court's precedents repeatedly emphasize that Congress does not need to use "magic words" to abrogate sovereign immunity. *Id.*, at 48 (quotation marks omitted); see *FAA* v. *Cooper*, 566 U. S. 284, 291 (2012); *Kimel* v. *Florida Bd. of Regents*, 528 U. S. 62, 76 (2000); *Lac du Flambeau Band of Lake Superior Chippewa Indians* v. *Coughlin*, 599 U. S. 382, 388 (2023). Congress must simply make a waiver of sovereign immunity "clearly discernable" from the "sum total" of its work. *Kirtz*, 601 U. S., at 55 (quotation marks omitted). The Helms-Burton Act did that here, through the many provisions indicating that the Act waives the foreign sovereign immunity of Cuban agencies and instrumentalities.

The Cuban government defendants point out, however, that the Helms-Burton Act directly amended the FSIA to add an exception to its execution-immunity provisions, which ensured execution immunity for foreign nations' diplomatic property. See 110 Stat. 818. But execution and jurisdictional immunity are separate concepts. See *Republic of Argentina* v. *NML Capital, Ltd.*, 573 U. S. 134, 142 (2014). So Congress's choice to amend the FSIA's provisions on execution immunity tells us nothing about whether Congress supplanted the FSIA with respect to jurisdictional immunity.[5]

---

[5] The Cuban government defendants (and the dissent) argue that the Act's execution-immunity provisions may still prevent Exxon from

*Fourth*, the Cuban government defendants (and the dissent) say that an earlier draft of the Helms-Burton Act expressly waived sovereign immunity, whereas the final version did not.  See H. R. 927, 104th Cong., 1st Sess., §302(c) (Feb. 14, 1995); S. 381, 104th Cong., 1st Sess., §302(c) (Feb. 9, 1995).  But that earlier version waived the sovereign immunity of the foreign governments themselves. See H. R. 927, §302(a)(1).  After some objections, Congress removed that provision and instead applied the cause of action against foreign agencies and instrumentalities, and not directly against the sovereigns.  See H. R. 927, 104th Cong., 1st Sess., §302(a)(1) (Aug. 4, 1995).  And in any event, that argument is simply another magic-words requirement.

\*          \*          \*

The Helms-Burton Act creates a private right of action that expressly runs against Cuban agencies and instrumentalities, expressly contemplates claims and judgments against those entities, expressly identifies §1331 (not §1330) as the source of subject-matter jurisdiction for suits under the Act, and expressly confers on the President—not the courts—gatekeeping authority over those suits.  Here, acting pursuant to the Act, the President has determined that permitting those suits will promote U. S. foreign policy interests.  Stacking an FSIA

_____

ultimately recovering on a judgment.  See *post*, at 8.  But that is no reason to disregard the clear waiver of jurisdictional immunity contained in the Helms-Burton Act.  As Exxon and the U. S. Government both persuasively explained, there can be real value in obtaining a judgment against a Cuban government defendant, even if a plaintiff is unable to immediately collect on that judgment.  See Tr. Oral Arg. 100–101, 48–49.  For example, depending on future developments in the law or in Cuba, a plaintiff may be able to later collect on a judgment.  Or a judgment (and others like it) may provide further leverage against Cuba and corresponding incentives for Cuba to democratize.  Cf. Brief for United States as *Amicus Curiae* 24; 22 U. S. C. §6082(d).

requirement on top of the Helms-Burton Act would thwart Congress's design and directly contravene the President's foreign policy judgments.  We reverse the judgment of the U. S. Court of Appeals for the D. C. Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———

No. 24–699

———

## EXXON MOBIL CORPORATION, PETITIONER *v.* CORPORACIÓN CIMEX, S. A. (CUBA), ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 23, 2026]

JUSTICE KAGAN, with whom JUSTICE SOTOMAYOR and JUSTICE JACKSON join, dissenting.

The Foreign Sovereign Immunities Act of 1976 (FSIA) provides that foreign states and their instrumentalities "shall be immune from the jurisdiction" of the federal courts unless an FSIA exception is met. 28 U. S. C. §1604. The FSIA is a comprehensive law, applying no matter the substantive law the plaintiff's claim invokes. The question here is whether the defendants, Cuban-owned companies, are immune from the jurisdiction of the federal courts. The answer should be just what the FSIA says: It depends on whether an FSIA exception is met. The Court instead concludes that the answer is no—not because of anything in the FSIA, but on the ground that a different law, the Helms-Burton Act, abrogates (in nonlegal speak, eliminates) the immunity that the FSIA may otherwise grant. The problem for the majority is that the bar for finding congressional abrogation is high, and the Helms-Burton Act falls short. Because there is no abrogation in that Act—even in hiding, as the majority finds—I respectfully dissent.

## I

To litigate a claim against a sovereign defendant— whether foreign (as here) or domestic—the plaintiff must establish two things: a cause of action, and an abrogation of

sovereign immunity.  The two are "analytically distinct." *FDIC* v. *Meyer*, 510 U. S. 471, 484 (1994).  A cause of action exists if "the source of substantive law upon which the claimant relies provides an avenue for relief." *Ibid.*  By contrast, the immunity inquiry turns on the state defendant's amenability to suit—that is, whether Congress has made the defendant, even though sovereign, subject to the jurisdiction of the federal courts.  The creation of a cause of action and the abrogation of immunity do not always travel together: Rather, Congress can do one without doing the other.  For example, the FSIA's exceptions generally abrogate immunity without supplying a cause of action; and conversely, most statutory causes of action are subject to the FSIA's immunity rules.  So Congress's abrogation of a defendant's immunity does not, on its own, give a plaintiff a cause of action against that defendant; and, critically here, Congress's creation of a cause of action does not, standing alone, tell us whether Congress has abrogated immunity.

To do the latter, Congress must make its intent to abrogate "unmistakably clear in the language of the statute." *Department of Agriculture Rural Development Rural Housing Service* v. *Kirtz*, 601 U. S. 42, 49 (2024).  That does not mean Congress must use magic words saying that immunity is abrogated.  Nor does it mean, as to a foreign defendant, that Congress must amend the FSIA directly.  But an abrogation of immunity must be "clearly discernible from the sum total" of Congress's work.  *Id.*, at 54–55.  The standard is a "stringent" one.  *Financial Oversight and Management Bd. for P. R.* v. *Centro De Periodismo Investigativo, Inc.*, 598 U. S. 339, 346 (2023) (*FOMB*).  And that is especially so when dealing with foreign (as opposed to domestic) immunity, because Congress enacted the FSIA specifically to deal with immunity questions—to serve as "a comprehensive framework for resolving any claim of [foreign] sovereign immunity," in general compliance with international

law.  *Republic of Austria* v. *Altmann*, 541 U. S. 677, 699
(2004); see *Bolivarian Republic of Venezuela* v. *Helmerich
& Payne Int'l Drilling Co.*, 581 U. S. 170, 179 (2017).[1]

   This case involves a suit brought under the Helms-Bur-
ton Act against Cuban-owned companies, and the question
is whether those defendants are immune from suit.  All
agree that Helms-Burton supplies a cause of action.  And
all agree that the FSIA grants the defendants presumptive
immunity from suit: They "shall be immune from the juris-
diction" of the federal courts unless an FSIA exception is
met.  28 U. S. C. §1604.  But Exxon argues that the FSIA's
strictures do not apply because Helms-Burton makes "un-
mistakably clear" an abrogation of the immunity that the
FSIA may otherwise grant the defendants.  *Kirtz*, 601 U. S.,
at 49.  The majority accepts that argument, but it is wrong.

   The first clue that Helms-Burton does not abrogate sov-
ereign immunity is the statute's language—which says not
one word on the topic.  The Act provides a cause of action,
stating that "any person" who "traffics in property which
was confiscated by the Cuban Government" "shall be liable
to any United States national who owns the claim to such
property."  22 U. S. C. §6082(a)(1)(A).  No mention of im-
munity there.  The Act also defines the "person" trafficking
in property comprehensively, as "any person or entity, in-
cluding any agency or instrumentality of a foreign state."
§6023(11).  No mention of immunity there either.  That pro-
vision helps define the scope of the cause of action, but with-
out saying whether a state defendant in a given case can
invoke immunity.  In other words, the plain text of the Act
provides a "source of substantive law" under which a plain-
tiff can sue foreign instrumentalities.  *Meyer*, 510 U. S., at

───────────

   [1] There is, by contrast, no "Domestic Sovereign Immunities Act"—*i.e.*,
no "comprehensive framework for resolving any claim of [domestic] sov-
ereign immunity."  *Altmann*, 541 U. S., at 699.  Rather, Congress has
approached abrogation of domestic sovereign immunity on a statute-by-
statute basis.

484.  But the Act says nothing about the "distinct" question whether or when the immunity of those instrumentalities is abrogated.  *Ibid.*

The absence of that language, though not dispositive, is telling because Helms-Burton did amend the FSIA as to a different matter.  The key background fact here is that the FSIA grants foreign states and instrumentalities *two* kinds of immunity: not just the immunity from suit ("jurisdictional" immunity) this case is about, but also "execution" immunity, rendering the property of state defendants "immune from attachment[,] arrest[,] and execution" absent an applicable exception.  28 U. S. C. §1609.  And while leaving untouched the FSIA's jurisdictional-immunity provision, Helms-Burton changed the FSIA's execution-immunity rule: "Notwithstanding the provisions of [the FSIA], the property of a foreign state shall be immune from attachment and from execution in an action brought under [Helms-Burton] to the extent that the property is a facility or installation used by an accredited diplomatic mission for official purposes."  §1611(c).  The content of that amendment is not relevant to this case (though it may be of interest that the amendment expands, rather than contracts, a sovereign's execution immunity).  Rather, the amendment matters because it shows that Congress thought the FSIA would otherwise apply to any Helms-Burton suit against a sovereign defendant.  Yet even so, Congress chose not to change even a jot of the FSIA's jurisdictional-immunity rule.  This Court often says that "[w]hen Congress amends one statutory provision but not another," we "presume[]" it "acted intentionally."  *Gross* v. *FBL Financial Services, Inc.*, 557 U. S. 167, 174 (2009).  Applied here, that principle requires the Court to respect Congress's decision to leave the FSIA's jurisdictional-immunity provision alone.

What is more, Congress specifically considered amending the FSIA to abrogate jurisdictional immunity—and elected not to.  The original version of the Helms-Burton Act would

have amended the FSIA to except all actions brought under the Act "with respect to confiscated property." H. R. 927, 104th Cong., 1st Sess., §302(c) (1995); S. 381, 104th Cong., 1st Sess., §302(c) (1995). But the Department of Justice objected that the proposed FSIA amendment would "represent[] a potentially sweeping extension of U. S. court jurisdiction over foreign sovereigns or their agencies and instrumentalities," not in keeping with "international practice." App. to Brief for Corporación CIMEX 7a. So Congress reconsidered, and enacted Helms-Burton without that FSIA amendment. In short, Congress knew the FSIA grants jurisdictional immunity (with certain exceptions) to foreign instrumentalities; debated whether to abrogate that immunity when the instrumentalities were sued under Helms-Burton for trafficking in confiscated property; and decided against taking that action.[2]

Even with all that, Exxon might have a good argument under our precedents if it could show that Congress's creation of a cause of action in Helms-Burton would be negated absent an abrogation of immunity. The key decision, as is evident in the majority opinion, is *Department of Agriculture* v. *Kirtz*. There, the Fair Credit Reporting Act (FCRA) supplied a cause of action against agencies of the Federal Government. Because the FSIA does not have a domestic equivalent—that is, a statute setting out a sovereign immunity framework with exceptions, see *supra*, at 3, n. 1—a plaintiff could *never* have sued the Government under the cause of action the FCRA gave unless that statute also

_____

[2] The majority waves away Congress's choice to drop the FSIA amendment by noting that the original bills also provided that foreign states themselves could be sued. See *ante*, at 21. But that observation only underscores that Congress's omission of the FSIA amendment was deliberate: Congress originally envisioned a cause of action with a more sweeping reach, and then pared it back—both by excluding foreign states from the set of potential defendants and by requiring plaintiffs to satisfy an FSIA exception in order to sue foreign instrumentalities.

(implicitly) abrogated immunity. We therefore concluded that the FCRA did so, lest its cause of action be "negat[ed]." *Kirtz*, 601 U. S., at 50. Absent such an abrogation, Congress would have "authorize[d] a suit against a sovereign with one hand, only to bar it with the other." *Ante*, at 11 (quoting *FOMB*, 598 U. S., at 348).

But that is not true here, because reading Helms-Burton as it was written—that is, without an abrogation provision—does not "negate" the cause of action it authorized. *Kirtz*, 601 U. S., at 50. The sovereign entities included within Helms-Burton's cause of action are not agencies of the Federal Government, as in *Kirtz*, but foreign instrumentalities. And the FSIA sets out a "comprehensive framework" listing the circumstances in which such an instrumentality is subject to suit. *Altmann*, 541 U. S., at 699. So unlike in *Kirtz*, a plaintiff here may be able to use the cause of action Congress provided without our reading an abrogation of immunity into the substantive statute. In other words, a plaintiff can sue a foreign instrumentality under Helms-Burton even if that statute does not also abrogate immunity. All the plaintiff must do is establish that an FSIA exception to immunity applies—which Exxon may have accomplished in this very case.[3]

And even assuming most plaintiffs could not meet an FSIA exception, the Helms-Burton cause of action still has plenty of work to do in the statutory scheme. Recall that the cause of action authorizes suit against "any person"—

——————
[3] The District Court found that one of the FSIA exceptions did apply; on appeal, the D. C. Circuit remanded for further factfinding on that question. See 111 F. 4th 12, 32–37 (2024). I take no position on the District Court's finding, but the majority is wrong to suggest that it must be in error given the embargo on Cuba. See *ante,* at 11–12. At the time Helms-Burton was passed, as now, the embargo permitted varied categories of commercial activity between United States nationals and Cuban instrumentalities. See 31 CFR §515.533 to §515.591 (2025). Those activities, in turn, could enable a Helms-Burton suit to meet one of the FSIA's exceptions. See 28 U. S. C. §1605(a)(2).

including a private individual or company—that traffics in confiscated property. 22 U. S. C. §§6023(11), 6082(a)(1)(A); see *supra*, at 3. That fact reveals that Cuban-owned companies were only part of a much broader class of defendants subject to suit under Helms-Burton. And in a "findings" section of the statute, Congress explained why—indeed, explained that the statute primarily targeted private investors. §6081. The Cuban regime, Congress there observed, had sought to ease the financial strain of the embargo by "offering foreign investors the opportunity" to profit from property "confiscated from United States nationals." §6081(5). That private "'trafficking' in confiscated property," Congress continued, "provide[d] badly needed financial benefit, including hard currency," to the Cuban regime, and thereby "undermine[d]" the embargo. §6081(6). So Congress created the cause of action—principally, to "deter" foreign investors from taking up Cuba's offer to profit off of "Castro's wrongful seizures." §6081(11). No suit against a Cuban-owned company is needed for that deterrence to work. Rather, the cause of action can well achieve its primary goal when plaintiffs sue private parties—as in a case this Court heard earlier this Term. See, *e.g.*, *Havana Docks Corp.* v. *Royal Caribbean Cruises, Ltd.*, 608 U. S. \_\_\_ (2026).

All to say, we need not find an abrogation lurking between the lines in the Helms-Burton Act to render Congress's work comprehensible. The statute is perfectly coherent as written. It enables plaintiffs to sue any private parties that traffic in confiscated property. And it also enables plaintiffs to sue foreign instrumentalities when their trafficking falls within an FSIA exception—meaning, that their activity meets the conditions Congress has decided should strip immunity from a sovereign. That construction adheres to the text of both the Helms-Burton Act and the FSIA, with no conflict between the two and no hidden abrogation.

II

The majority's first wrong turn is to reduce *Kirtz* to an over-simplified formula: cause of action plus potential sovereign defendant ("check," "check") equals abrogation of sovereign immunity. *Ante*, at 10. The Helms-Burton Act creates a cause of action and defines the potential defendants to include foreign instrumentalities. Ergo, the Helms-Burton Act abrogates those instrumentalities' immunity— or so goes the majority's logic. But as discussed earlier, *Kirtz* required more. See *supra*, at 5–6. It required that the cause of action provided against sovereign defendants be inexplicable absent an abrogation—that Congress would have provided the action only to take it away. See 601 U. S., at 50–51; see also *FOMB*, 598 U. S., at 348 ("The very suits allowed against governments would automatically have been dismissed"). In fact, the majority appears to recognize its argument's inadequacy, because it reserves the question whether Helms-Burton abrogates the immunity of non-Cuban foreign instrumentalities. See *ante*, at 18, n. 4. If the majority's check-check equation really were valid, there would be no question to reserve. Helms-Burton, after all, gives the same cause of action against non-Cuban foreign instrumentalities as it does against Cuban ones.

The majority next insists that its reading is necessary to guarantee victims of confiscation "*fully effective remedies*," *ante*, at 13 (emphasis in original)—which sounds good, but turns out to be a hollow promise. The majority's thinking is that if the FSIA's jurisdictional-immunity provision applies, only a few suits would "make it out of the starting blocks" (because only a few would satisfy the FSIA's exceptions). *Ante*, at 12. But the added suits that will "make it out" under the majority's view will still falter before the finish line. That is because, as noted earlier, the FSIA makes the property of foreign states immune from execution to satisfy a judgment, unless certain exceptions apply. See *supra*, at 4. Although Exxon contests that those execution-

immunity provisions govern here, see Brief for Exxon 48, the majority does not, see *ante*, at 20–21, and n. 5. So under its view, even a plaintiff who obtains a judgment against a Cuban-owned company faces a problem: He will never get his judgment enforced—never collect any money for it—unless one of the FSIA's execution-immunity exceptions is satisfied. And the plaintiff will not satisfy one of those exceptions if he does not satisfy an FSIA exception to bring suit in the first place. The upshot is that the majority's "*fully effective remedies*" are not remotely so: In fact, it turns out that they are no better than the ones available under my construction.[4]

The majority turns third to procedure, but with no greater success. The Act, it observes, provides that certain procedural provisions and rules apply as they would in "any other action brought under section 1331 of title 28"—*i.e.*, the general federal-question statute. §6082(c)(1); see *ante*, at 13. Because suits subject to the FSIA are brought under §1330 rather than §1331, the majority infers that Helms-Burton suits against foreign sovereigns cannot be subject to the FSIA. See *ante*, at 13–14. But that inference just reveals the majority's tunnel-vision perspective on Helms-Burton's coverage. Contrary to what the majority seems to think, most Helms-Burton suits are brought against private parties, not Cuban instrumentalities. So most of those

_____

[4] The majority's response is that there is "value in obtaining a judgment against a Cuban government defendant" even if there is no apparent path to converting it into money. *Ante*, at 20–21, n. 5. But exactly what value? The majority seems to rely mainly on a contingency—that the laws on execution immunity could change some fine day. The majority also suggests that obtaining a judgment against a Cuban instrumentality will pressure Cuba to democratize, though why a judgment that is unenforceable—so has no monetary consequence—would have that effect is left unexplained. In any event, neither account of the supposed value of an unenforceable judgment can come close to justifying the extravagant claim that the majority's approach will provide Helms-Burton plaintiffs with "*fully effective remedies.*" *Ante*, at 13 (emphasis in original).

suits will be brought under §1331, not §1330 (even presuming the FSIA applies to the sovereign defendants occasionally sued). For that reason, Congress's reference to §1331 makes perfect sense, and does not "read 'other' out of the statute." *Ante,* at 15. Because most Helms-Burton suits are §1331 suits, Congress naturally provided that the procedural rules applicable in "other" §1331 suits should apply. I see nothing to suggest an abrogation of immunity in that provision, much less an "unmistakably clear" one. *Kirtz,* 601 U. S., at 49.

Finally, the majority puts undue weight on a provision allowing the President to suspend Helms-Burton suits. See 22 U. S. C. §6085(c). As the majority sees it, that provision was designed to restore the pre-FSIA regime in which courts deferred to Executive Branch determinations about sovereign immunity. See *ante*, at 5–6, 15–17. Of course, Congress could have done something like that, by amending the FSIA itself or stating in Helms-Burton that the FSIA does not apply there. But the suspension provision is not a good fit for that result. Once again, the suits brought under that Act are mostly against private parties. The suspension provision enables the President to stop all of those suits, in addition to the ones against Cuban instrumentalities. So contra the majority, that provision is not reasonably understood to have as its object the alteration of the usual rules of sovereign immunity.

\*    \*    \*

Nothing in the text or "architecture" (*ante*, at 9) of the Helms-Burton Act suggests that Congress abrogated the sovereign immunity of these defendants—much less that it did so with the requisite unmistakable clarity. And nothing in this case presents a choice between giving effect to the Helms-Burton Act and preserving the immunity codified in the FSIA. So I would apply both laws as Congress wrote them. That means, as the lower courts here held, that

KAGAN, J., dissenting

Exxon's suit can proceed if—but only if—it can show an FSIA exception is satisfied.